# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
February 15, 2011 Session

## STATE OF TENNESSEE v. TODD JOSEPH SWEET a/k/a JAMIE LEE TURPIN

**Direct Appeal from the Circuit Court for Monroe County**
**No. 08-081    Carroll L. Ross, Judge**

_____

**No. E2010-00728-CCA-R3-CD - Filed December 16, 2011**

_____

A Monroe County jury convicted the Defendant, Todd Joseph Sweet, of two counts of forgery and two counts of criminal simulation, and the trial court sentenced him to sixteen years in the Tennessee Department of Correction.  On appeal, the Defendant contends: (1) the trial court improperly denied his motion to dismiss for failing to try him within 180 days of his transfer, as proscribed by the Interstate Compact on Detainers; (2) the trial court improperly denied his request for severance; (3) the trial court improperly denied his motion for a mistrial based on the State's introduction of evidence of the Defendant's other crimes; (4) the trial court improperly refused to strike the State's "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions"; (5) the trial court improperly refused to excuse six jurors who had media knowledge of other crimes the Defendant allegedly committed; (6) the trial court improperly allowed the State to re-call witness A.J. Smith in order to prove venue; (7) the State failed to prove venue; (8) the trial court failed to properly instruct the jury; (9) the evidence is insufficient to support his convictions; (10) the State failed to comply with Tennessee Rule of Criminal Procedure 16 when it failed to provide the Defendant's trial counsel with letters written by the Defendant and intercepted by the Monroe County Sheriff's Department; and (11) the trial court erred when it sentenced him.  After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court THOMAS T. WOODALL, J., joined.  DAVID H. WELLES, Sp. J., not participating.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the Appellant, Todd Joseph Sweet.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Steven Bebb, District Attorney General, and Paul Rush, Assistant District Attorney

General, for the Appellee, State of Tennessee.

# OPINION
## I. Facts
### A. Indictment, Compact Request, & Pre-trial Hearings

This case arises from the Defendant passing fraudulent checks. Based on this conduct, on April 3, 2008, a Monroe County grand jury indicted the Defendant in Case Number 08-081[1] with four counts of criminal simulation and four counts of forgery, all charges alleged to have occurred in Monroe County. We summarize the supporting facts in each of the indictments as follows:

> **Count 1** charged the Defendant with forging a check in the amount of $175,500 on February 19, 2008, written to victim James David Poe from the account of "Ms. Jamie Turpin" without Ms. Turpin's consent.
>
> **Count 2** charged the Defendant with committing criminal simulation involving an amount greater than $60,000 through his use of a check numbered "501" on February 19, 2008, written to victim James David Poe on the account of "Ms. Jamie Turpin" by altering the name to appear as "Mr. Jamie Turpin" so that the instrument appeared valid.
>
> **Count 3** charged the Defendant with forging a check in the amount of $2,000,000 on February 18, 2008, written to victim James David Poe from the account of "Ms. Jamie Turpin" without Ms. Turpin's consent.
>
> **Count 4** charged the Defendant with committing criminal simulation involving an amount greater than $60,000 through his use of a check numbered "503" on February 18, 2008, written to victim James David Poe from the account of "Ms. Jamie Turpin" by altering the name to "Mr. Jamie Turpin" to make the instrument appear valid.
>
> **Count 5** charged the Defendant with forging a check in the amount of $250,000 on February 19, 2008, to victim A.J. Smith from the account of "Ms. Jamie Turpin" without Ms. Turpin's consent.
>
> **Count 6** charged the Defendant with committing criminal simulation involving an amount greater than $60,000 through his use of a check numbered "1000" on February 19, 2008, written to victim A.J. Smith from the account of "Ms. Jamie Turpin" by altering the name to "Mr. Jamie Turpin" to make the

---

[1]Also pending before this Court is the Defendant's appeal from his indictment in case number 08-082, which alleged that he committed theft over $10,000. Oral arguments in both cases were heard in February 2011, and this Court will file a separate opinion in case 08-082, the appeal number of which is E2010-00729-CCA-R3-CD.

instrument appear valid.

**Count** 7 charged the Defendant with forging a check in the amount of $27,000,000 on February 19, 2008, to victim A.J. Smith from the account of "Ms. Jamie Turpin" without Ms. Turpin's consent.

**Count 8** charged the Defendant with committing criminal simulation involving an amount greater than $60,000 through his use of a check numbered "1001" on February 19, 2008, written to victim A.J. Smith from the account of "Ms. Jamie Turpin" by altering the name to "Mr. Jamie Turpin" to make the instrument appear valid.

On April 6, 2008, Arizona law enforcement arrested the Defendant for charges against the Defendant pending in the state of Arizona. The Defendant waived extradition. On September 16, 2008, the Defendant, who remained in Arizona state custody, sent a request pursuant to the Interstate Compact on Detainers for disposition of the "4 Counts Criminal Simulation" and "4 Counts Forgery" pending against him in Monroe County. The Monroe County Criminal Court Clerk received a copy of this request on September 22, 2009. On October 10, 2008, the Monroe County District Attorney General's Office also received a copy of the Defendant's Interstate Compact request.[2]

On November 13, 2008, the Defendant was transported from Arizona to Monroe County. The Defendant was arraigned in Monroe County on this case on November 17, 2008. During his arraignment, the State informed the trial court that the public defender's office had been appointed to represent the Defendant but, due to a conflict, was unable to represent the Defendant. When the trial court questioned the Defendant concerning his financial resources, the Defendant told the trial court he had millions of dollars in Malaysian bank accounts as well as other assets:

| | |
|---|---|
| [trial court]: | Do you have any cash in any banks anywhere? |
| [the Defendant]: | Not in the U.S. |
| [trial court]: | Do you own a vehicle–pardon? |
| [the Defendant]: | Not in the U.S. |
| [trial court]: | Not in the U.S.? Where do you have cash in any banks? |
| [the Defendant]: | Malaysia. |
| [trial court]: | In Malaysia? In other countries you have–how much cash do you have in Malaysia? |

---

[2]The record includes a U.S. Postal Service Certified Mail Receipt reflecting that District Attorney General Steve Bebb received the Defendant's request for disposition of his Monroe County charges on October 10, 2008. The record also contains, however, a letter dated October 6, 2008, from Assistant District Attorney General Paul Rush requesting the Defendant be sent from Arizona to Monroe County.

| [the Defendant]: | I don't know. |
| [trial court]: | You don't know? |
| [the Defendant]: | I don't know. |
| [trial court]: | Well, give me a good guess. |
| [the Defendant]: | Multi-millions. |
| [trial court]: | Well, then you'll have to hire your own attorney, sir. |
| [the Defendant]: | Okay. |
| [trial court]: | If you're worth millions of dollars, I'm not going to appoint you an attorney to represent you in these matters, so . . . we'll set you an attorney status for January the 26th. |

Accordingly, the proceedings were concluded, and the Defendant's attorney status update hearing was set for January 26, 2009.

At his attorney status hearing on January 26, 2009, the Defendant acknowledged that he had not yet hired an attorney. At the trial court's request, the Defendant filled out an affidavit of indigency. In the affidavit, the Defendant claimed to own automobiles valued at over $100,000 and to possess several million dollars in offshore bank accounts. When asked why he did not use his financial resources to hire an attorney, the Defendant responded that he could not access his accounts from the U.S. The trial court stated that it believed the Defendant was "playing with the court" and announced that it would appoint a lawyer for the Defendant. At this point, the State's attorney interjected, asserting that, under the Interstate Compact, Monroe County had "six months from the date that [it got the Defendant] from Arizona" in which to try the Defendant. Based upon the Defendant's arrival date to Monroe County on November 13, 2008, the State estimated that the Defendant's trial on these matters must be held before May 13, 2009. Accordingly, the State requested that the trial court set the Defendant's trial on or before April 14, 2009. The trial court set the Defendant's trial for February 24, 2009, and appointed counsel, noting that counsel would "have to take some time" to prepare for trial. Counsel who the trial court appointed was not present during this hearing.

On February 23, 2009, at a status hearing update, the Defendant and his appointed counsel indicated they were ready for trial, but the State moved to continue the trial until April 13, 2009, in order to arrange for a witness to travel from Canada to testify. The trial court noted its displeasure with the State's delay, but it granted the motion to continue. The trial court scheduled a status hearing for April 13, 2009, and the first day of trial for April 14, 2009. On March 23, 2009, the State filed a "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions." In its notice, the State declared its intent to seek an enhanced punishment based upon the following convictions against the

4

Defendant in the state of Michigan: three convictions from 2003 and 2006 for larceny by conversion in an amount over $1000; one 1995 conviction for larceny in an amount over $1000; one 1994 conviction for carrying a concealed weapon; and two 1996 convictions for larceny by check.

On April 9, 2009, the Defendant moved to dismiss the charges against him in this case based on the State's failure to commence trial within the 180-day Interstate Compact period, and it moved to strike the State's "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions," arguing that the State should have filed this notice before the day trial was originally set to begin.

At the April 13 status hearing, the trial court heard arguments on the Defendant's motions. The Defendant argued his motion to dismiss should be granted because, due to the fact that the District Attorney's Office received the Defendant's Interstate Compact request on October 10, 2008, the 180-day period in which the Defendant could be tried expired on April 8, 2009. The trial court denied this motion, finding that the Defendant was responsible for delaying the trial for two months by "insist[ing] that he wanted to hire his attorney" and that the State in "good faith" requested a continuance in order to arrange for a witness to travel from Canada.

The Defendant also argued that the trial court should grant his motion to strike the State's "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions" because the State should have filed its notice ten days before the original February 24 trial date. The State responded that it was delayed in discovering the Defendant's prior convictions because the Defendant had operated under a variety of aliases. The Defendant responded that the Defendant's convictions were under the name "Todd Joseph Sweet," the same name under which he was indicted in the present case. The record includes copies of the Defendant's criminal convictions from Michigan, which indeed list the Defendant's name as "Todd Joseph Sweet." The trial court found that the State complied with Tennessee Rule of Criminal Procedure 12.3's notice provisions and refused to grant the Defendant's motion.

### B. Motion to Sever

The following day, the Defendant moved for a severance of the eight counts of the Indictment, which the indictment identified as having been committed on two separate dates, February 18, 2008, and February 19, 2008. The Defendant argued first that no common plan or scheme existed and second that the proof of one would not be admissible in the trial of the other if the cases were tried separately. The State argued that all the alleged conduct was part of a common plan or scheme, asserting that the offenses occurred within one day of each

5

other. The trial court found that, based on the dates in the indictment, the alleged offenses occurred within one day of each other. The trial court explained that, in its view, the alleged conduct was "the kind of thing that the State [could] proceed [upon in] one indictment as one set of factual situations," and it found that the conduct was part of a "common scheme or plan." It noted that the facts would be "intermingled as far as who did what and who said what and where things happened." The trial court denied the Defendant's motion to sever the offenses listed in the indictment.

## C. Trial

The Defendant's case proceeded to trial on April 14, 2009, and the following evidence was presented: A.J. Smith testified that he lived on a dairy farm known as "Springbrook Farm" in Sweetwater, Tennessee. In February 2008, the Defendant, whom he knew as "Jamie Turpin," came to Mr. Smith's farm, offering to purchase the farm. After Mr. Smith told the Defendant that the farm was not for sale, the Defendant told Mr. Smith he had recently married Donna Poe, the daughter of Danny Poe, who owned land adjacent to Smith's land. The Defendant told Mr. Smith that he had been wounded during his military service in Iraq. He explained that his wife liked Mr. Smith's farm and that he intended to buy it for her. The Defendant told Mr. Smith the financial resources he would use to purchase the farm were comprised from a recent inheritance he received and the proceeds from the sale of his home in Canada, which netted him a large sum of money. The Defendant asked Mr. Smith to price the farm, and Mr. Smith agreed, telling the Defendant he would give the Defendant an answer within the next four or five days. Mr. Smith testified that this meeting took place in the kitchen of his home.

A few days later, the Defendant returned to Mr. Smith's home, and Mr. Smith suggested the two drive around the farm in order to take a look at the property. As the two got into Mr. Smith's truck, the Defendant tossed a pistol into the truck's bed, explaining to Mr. Smith that he had to protect himself because he was carrying a large amount of money. After the two drove around examining Mr. Smith's property, Mr. Smith suggested the price of $25,000,000 for the entire farm. The Defendant agreed to this price and offered to make a down payment of $5,000,000 toward the price of the farm at the time the two signed a contract reflecting the sale of the property.

Later the same day, the Defendant brought Donna Poe over to Mr. Smith's property, wishing to show her around the farm. Mr. Smith and Ms. Poe, who were already acquainted, had a brief conversation during which Ms. Poe confirmed the Defendant's story about his finances. During this afternoon visit, the Defendant and Mr. Smith agreed that the $25,000,000 asking price would include all of the houses on the property.

6

Following this meeting, the Defendant and Mr. Smith spoke on a daily basis, gradually developing the terms of the contract of sale for Mr. Smith's farm. At the Defendant's request, Mr. Smith allowed him and Ms. Poe to move into a house on his property, that belonged to one of Mr. Smith's sons, while the two finalized the terms of the sale. Ultimately, the Defendant and Ms. Poe stayed in this house for three weeks. At some point during this time, the Defendant introduced Mr. Smith to a woman named "Jen" whom he said he employed. By this time, Ms. Smith was not sure whether the Defendant's claims of vast financial resources were true. Hoping to ease his growing suspicion that the Defendant was lying about his finances, Mr. Smith privately commented to the woman that the Defendant "must have sold an awful big house" in Canada, and the woman responded, "Yeah, it was a monster." In the courtroom during trial, Mr. Smith identified witness Jamie Turpin as the woman introduced to him as "Jen."

In connection with this sale, the Defendant gave Mr. Smith three checks, only two of which are at issue in this case. The first check, dated February 19, 2008, was for $27,000,000. The memo line of the first check reads, "Hold on Springbrook Farm." Mr. Smith observed the Defendant sign his name as "Jamie Turpin" on the check. Later, Mr. Smith realized that the printed name of the account holder on the check had been altered from "Ms." to "Mr." Jamie Turpin. The next day, the Defendant gave Mr. Smith a second check, which was dated February 19, 2008, and written in the amount of $250,000.[3] As with the first check, the Defendant signed the check as "Jamie Turpin" in Mr. Smith's presence, and Mr. Smith later realized that the "Ms." had been altered to "Mr."

In the three weeks following the Defendant's transfer of the checks to Mr. Smith, the men communicated on a daily basis regarding the terms of the sale of Mr. Smith's property. During this time, the Defendant continued to identify himself as "Jamie Turpin," never indicating that the checks he had written to Mr. Smith belonged to anyone but himself. At the advice of the realty company preparing the documents of sale for the transaction, Mr. Smith did not attempt to deposit or cash the checks he received from the Defendant. Because the transaction ultimately fell through, Mr. Smith never deposited or cashed the checks.

During the State's initial direct examination of Mr. Smith, Mr. Smith did not specify whether he and the Defendant were in Loudon or Monroe County when the Defendant gave him the two checks at issue. At the close of its case in chief, the State moved to reopen its proof and re-call Mr. Smith in order for him to testify for the limited purpose of establishing the county in which he received the checks. Over the Defendant's objection, the State was allowed to re-call Mr. Smith. On re-call, Mr. Smith testified that his property, Springbrook

---

[3]We note that the amounts in which these checks were written vary from the payments Mr. Smith testified he and the Defendant agreed to. The record does not explain this variance.

Farm, lay in both Monroe and Loudon Counties. He testified that the initial meeting in the kitchen of his home took place in Loudon County. He testified that the meetings during which the Defendant gave him the checks at issue in this case, however, took place on a farm building located in Monroe County. Mr. Smith said this farm building was located about one mile from his home. He explained that he was sure the farm building lay within Monroe County because he paid Monroe County property taxes on the building every year.

Counts One through Four of the indictment concerned instruments the Defendant passed to James David Poe. Mr. Poe testified that, in 2007, the Defendant began dating his daughter, Donna Poe. By 2008, Donna was pregnant, and she and the Defendant began living with Mr. Poe in his house in Loudon County. Mr. Poe and the Defendant began planning to open a dairy farm together. Mr. Poe testified that, in January 2008, the Defendant gave Mr. Poe a $2,000,000 check written from the credit card account of "Jamie Turpin" while the two were in his Loudon County home. He testified that, though the Defendant never indicated "what payment" the $2,000,000 check was supposed to cover, it was written in conjunction with their plan to open a dairy farm together. Mr. Poe testified that the Defendant gave him a second check in the amount of $175,000 from the same credit card account as the first. The Defendant made the second check payable to "Poe Turpin Dairy, RE: James David Poe." Mr. Poe testified that this check was intended to cover the start-up costs of the dairy farm they planned to open on the land the Defendant was to purchase from Mr. Smith. He said he also received this check while in his Loudon County home.

At this point in the testimony the parties held a jury-out hearing where it was determined that, because the conduct underlying Counts One through Four took place in Loudon County, the Monroe County District Attorney did not have jurisdiction to prosecute Counts One through Four. Accordingly, the State agreed to dismiss Counts One through Four of the indictment with prejudice. The trial court issued the following instruction to the jury:

> [B]efore we took the last recess, there was a mention of a check allegedly taken out of Loudon County. An objection was made. I have sustained that objection. Whatever's alleged to have occurred that did not occur in [Monroe County], I would instruct you at this time you should disregard any testimony from this witness about any check in Loudon County. Whether or not that check exists is not a matter for your concern in this trial.

At a later point during trial, the Defendant moved for a mistrial based upon the State's introduction of Mr. Poe's testimony, and the trial court denied the Defendant's motion.

8

The State resumed with its case in chief, and Jamie Turpin testified that she is Canadian and that she is a registered nurse in Canada. In May of 2007, Ms. Turpin frequently patronized restaurants, shops, and bars, in Sault St. Marie, Michigan. One night when she was in a bar in Sault St. Marie, her ex-boyfriend introduced her to the Defendant, who first identified himself as "Douglas Clegg" but soon thereafter told her his name was "Joseph Draggone." The Defendant told Ms. Turpin that he was a business owner and that he and his brother had been in the area on business but that, after an argument, his brother left town with the Defendant's wallet, ID, money, and truck. The Defendant also told Ms. Turpin that he would give Ms. Turpin's ex-boyfriend a job.

The Defendant and Ms. Turpin soon began a romantic relationship. During this time, the Defendant told Ms. Turpin he was a millionaire and that he worked for a man in the mob. Later, he told Ms. Turpin that this man had died, leaving him with $5,000,000. He also said that he was in "special forces" with the U.S. Coast Guard. Initially, Ms. Turpin continued working full-time and the pair met in hotel rooms, for which Ms. Turpin paid. Ms. Turpin soon took time off from work and began traveling with the Defendant across the United States. At some point during this time, the Defendant asked Ms. Turpin for $10,000 for "security" purposes, and Ms. Turpin gave him the money from her savings. The Defendant also induced Ms. Turpin to obtain and allow him access to a $15,000 line of credit, telling her that, because his bank accounts were under surveillance, he could not obtain such credit himself. After Ms. Turpin provided the Defendant with this money and credit, the Defendant warned Ms. Turpin she and her family were in danger because they were under heavy surveillance and security. The Defendant convinced Ms. Turpin she must travel with him to Flagstaff, Arizona, in order to flee those who were pursuing her. The Defendant intimated that he would pay for this trip, but upon arriving in Arizona, Ms. Turpin realized the Defendant was merely using the money she had given him for "security" to pay for the trip.

The Defendant and Ms. Turpin spent about a week in Arizona, during which time the Defendant told Ms. Turpin that he was being pursued by seven men, and he appeared to make phone calls to individuals he told Ms. Turpin were military personnel. After a week in Arizona, Ms. Turpin and the Defendant traveled to Ohio where they stayed with Ms. Turpin's relatives. In late September or early October 2007, the Defendant told Ms. Turpin that the mob had been monitoring his cousin, Donna Poe, where she lived in Pigeon Forge, Tennessee, and that the two must travel to Pigeon Forge to protect her.

At this point in the Defendant and Ms. Turpin's relationship, the Defendant did not allow Ms. Turpin to access the internet or to go to her bank without his permission, and he had convinced Ms. Turpin to give him access to her online banking accounts. Without her authorization, the Defendant withdrew money from her banking accounts and took out several credit cards in her name. Ms. Turpin testified that she never gave the Defendant

9

permission to write checks against her accounts. On one occasion, Ms. Turpin tried to access her online accounts through a computer, but the Defendant became very angry, screaming at Ms. Turpin for having tried to access her accounts.

The pair traveled to Pigeon Forge, where they rented a cabin for ten days using Ms. Turpin's credit card. After staying at the cabin for only a few days, the Defendant warned Ms. Turpin that she must leave because a "military bust" was imminent. Ms. Turpin left and rented a room at a nearby hotel. After staying at the hotel for a week, she returned to the cabin. When she entered, she found the Defendant lying on the bed with another woman. Though both the Defendant and the woman were dressed and lying on top of the covers, Ms. Turpin became extremely upset. The Defendant told Ms. Turpin that the woman was his cousin Donna Poe. On October 17, 2007, Ms. Turpin returned to Canada, though she remained in constant contact with the Defendant, sending the Defendant money as he needed it.

In February 2008, the Defendant told Ms. Turpin that he was ready to start a new life with her. At the Defendant's request, Ms. Turpin traveled to Loudon, Tennessee, where she would stay in a series of hotel rooms for the next several weeks. When Ms. Turpin reunited with the Defendant, he instructed her that she would need to go by the name "Jen" while in Loudon and that she would need to tell people that she was the wife of the Defendant's "head of security" in Canada. Ms. Turpin heard the Defendant identify himself as "Jamie" during this time. Ms. Turpin asked the Defendant to explain why they had to go by assumed names, but the Defendant refused to explain anything, saying that if she cooperated, they could start their life together soon. Ms. Turpin confirmed that she met Mr. Poe and Mr. Smith during this time and that she identified herself as "Jen" to the men.

Ms. Turpin testified that, at one point during her relationship with the Defendant, a credit card company sent her a set of blank checks to use against a $5,000 credit account she had with the credit card company. When the Defendant told Ms. Turpin he needed the checks, she gave them to him, but she testified she did not believe the Defendant would use the checks for anything other than groceries. She testified that she was frightened of the Defendant at this time. At the State's request, Ms. Turpin reviewed the two checks the Defendant wrote to Mr. Smith, which the State had introduced as exhibits at trial. Ms. Turpin confirmed that these checks were from the set she received from her credit card company, but she testified that she did not authorize the Defendant to write the checks at issue. Ms. Turpin confirmed that the credit card checks at issue in this case were never sent to her credit card company for payment and that, as such, she never had to pay her credit card company for anything related to these checks.

At the conclusion of trial, the jury convicted the Defendant of two counts of criminal

simulation and two counts of forgery.

## D. Sentencing

Before being sentenced in this case, and in a separate trial in June of 2009, the Defendant was convicted of theft greater than $10,000 in Case Number 08-082. The trial court held a sentencing hearing wherein it sentenced the Defendant in this case and in Case Number 08-082. The following evidence was presented relevant to this case: The Defendant's presentence report indicated that the Defendant, who was thirty-six at the time of sentencing, dropped out of school in the eleventh grade, that he has gone by at least eight different aliases, and that, at the time of sentencing, an "escape from prison" charge was pending against him in Michigan.

The report included copies of seven Michigan judgments of convictions entered against the Defendant. According to these judgments, between 1993 and 2006, the Defendant was adjudged guilty of the following offenses in Michigan: one count of "larceny by conversion $1,000-$20,000," for which the Defendant received a five-year probation sentence; one count of "larceny by conversion-$10" as a "habitual offender 4th con [sic]," for which the Defendant was sentenced to a minimum of forty months and a maximum of twenty years and ordered to pay $16,500 in restitution; one count of "larceny by conversion -$10" as a "habitual offender 4th con [sic]," for which the Defendant was sentenced to a minimum of forty months and a maximum of twenty years; one count of "weapons-carrying concealed," for which the Defendant received a twenty-four month probation sentence; two counts of "false pretenses 0/$100.00," for which the Defendant received two sentences of confinement for a minimum of five years and a maximum of fifteen years and was ordered to pay $12,200 in restitution; one count of "check no account," for which the Defendant received a sentence of confinement for a minimum of one year and a maximum of two years; and one count of "attempted uttering & publishing," for which the Defendant received a two-year probation sentence and was ordered to pay $3,486.21 in restitution.

The officer who prepared the presentencing report noted that the Michigan Department of Corrections website indicated that at least three of the Defendant's larceny by conversion convictions were for "larceny by conversion-$10,000 to $20,000."

The report also indicated that in May 2009 the Defendant was convicted in Arizona of the following offenses: identify theft; theft up to $500; convicted felon in possession of a weapon; and theft of vehicle. The Defendant received a total effective sentence of three-years and six-months for these convictions, and he was ordered to serve one year of this sentence in confinement. The conduct underlying the Arizona convictions took place after the Defendant committed the crimes in this case and fled to Arizona from Tennessee.

The Defendant reported to the probation officer preparing the report that he suffered from post-traumatic stress disorder from childhood abuse and that, as an adult, he had been treated for depression and bi-polar mood disorder. The Defendant reported that he had been hospitalized three times due to his mental health issues, the impetus for one of these hospitalizations being a suicide attempt. Because the Defendant refused to authorize the officer preparing the report to access his medical records, the Defendant's description of his mental health history could not be confirmed.

The Defendant's report indicated he had one child with Donna Poe, who the presentence report identified as the Defendant's "cohabiting spouse," and he had two children from a previous marriage. He reported having been the owner/operator of a self-run business, "Finishline Custom Auto" and head of public relations for "Fabrizio Boccardi" in Las Vegas, Nevada. No record could be found of Finishline Custom Auto, and Mr. Boccardi of "Fabrizio Boccardi" denied ever having met or employed the Defendant.

The Defendant reported having over $1,000,000 worth of "4x4 trucks," "vehicles," and "sporting and water craft," all of which he claimed were tied up "in probate." He declined to include information about his bank accounts on the basis that "any and all bank accounts are not subject to U.S. tax laws." He claimed, however, that he had in his control $3,500,000, all of which he said was "illegally obtained" and which he was "willing to pay . . . to the victims and or court."

The trial court admitted a victim-impact statement from Jamie Turpin into evidence during sentencing. Ms. Turpin indicated that by "exploit[ing]"and "manipulating" her over a period of nine months, the Defendant ultimately induced her to give him $19,000 of her savings, quit her job as a nurse, take on $70,000 of debt, and convince her parents to give him $20,000. She reported that the methods the Defendant used to manipulate her, stories of mob ties and of being under constant surveillance, terrified her and led her and her parents to believe they were in danger. Ms. Turpin recalled that she was "terrified" of the Defendant, due to what he led her to believe he was capable of doing and to the fact that he carried a gun. She reported suffering from persistent anxiety and paranoia as a result of her relationship with the Defendant. Due to the notorious nature of the Defendant's crimes, details of her relationship with the Defendant and his crimes were published in newspapers across the United States and Canada, including her hometown of Saul Ste. Marie, Ontario. Ms. Turpin was unable to obtain employment in her hometown, and she was forced to move elsewhere to work and obtain counseling for emotional issues arising from her relationship with the Defendant. She stated that the Defendant was a "cold, calculating man" who "does not experience emotion as most people do and . . . is incapable of empathizing with his victims in any way." She asked that the Defendant be required to serve the maximum sentence for his actions.

At the sentencing hearing, the parties disagreed about whether the Defendant was a Range II offender, with defense counsel arguing that the State failed to establish that at least two of the Defendant's Michigan convictions were the equivalent of Class C felonies or higher under Tennessee law. A major source of conflict between the parties was whether the Michigan certified judgments of conviction reflecting two convictions for "larceny by conversion-$10," one of which ordered restitution in the amount of $16,200, were actually convictions for "larceny by conversion-$10,000 to $20,000," but whose offense description was truncated on the judgment form.

In more testimony related to the Defendant's previous convictions, Sean Patrick Moore, a probation officer with the Tennessee Department of Probation and Parole, testified that he completed the Defendant's presentence report in this case. The officer testified that he spoke with Yourvette Price, an employee of the Muskegon County Prosecutor's Office in Michigan in order to confirm the Defendant's criminal history in Michigan. He confirmed that the Defendant was considered an "escaped felon" in Michigan because he escaped from state custody while serving a sentence for crimes he committed in Michigan between 2002 and 2006.

On cross-examination, Officer Moore confirmed that he had never met Ms. Price of the Muskegon County Prosecutor's Office and that he did not know the nature of her employment with the prosecutor's office. He recalled that, in order to verify the Defendant's criminal record, he gave Ms. Price the case number associated with each of the Defendant's Michigan criminal convictions he was aware of, and Ms. Price searched through "their records" to find the criminal conviction associated with the case number. She confirmed the details Officer Moore possessed about the Defendant's criminal record, in particular that he had three convictions for larceny by conversion involving an amount between $1000 and $20,000. Officer Moore did not know the exact nature of the database Ms. Price used to retrieve the Defendant's convictions. Officer Moore confirmed that he also used the Michigan Department of Corrections website, a public-access website, to obtain information about the Defendant's criminal history.

After hearing argument from both sides, the trial court found that the Defendant's two 1996 false pretenses convictions from Michigan were Class C felonies and, on that basis, found that the Defendant was a Range II offender. The trial court noted that the Tennessee Code's classification of several of the Defendant's remaining convictions from Michigan was "not as clear." Based on the Defendant's criminal record as a whole, the trial court applied enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. T.C.A. § 40-35-114(1).

The trial court also applied the following enhancement factors: enhancement factor (3), that the offense involved more than one victim; enhancement factor (8), that, before sentencing, the Defendant failed to comply with the conditions of a sentence involving release into the community; enhancement factor (13), that, at the time the felony was committed, the Defendant was on escape status; and (14), that the Defendant abused a position of private trust. The trial court noted that it "[did] not really put any emphasis" on enhancement factor (14). T.C.A. § 40-35-114(3), (8), (13), and (14).

For each of his convictions in this case, which included two counts of forgery and two counts of criminal simulation, the trial court imposed a sixteen-year sentence, to be served concurrently to one another. For his conviction for theft over $10,000 in Case Number 08-802, the trial court imposed a six-year sentence, to be served consecutively to his sentences in this case, for a total effective sentence of twenty-two years. The trial court specified that the Defendant's twenty-two year sentence in these cases would be consecutive to any sentence he might receive from a conviction stemming from the escape charge pending against him in Michigan. The trial court imposed a fine of $110,000.

Although the length of the Defendant's sentence made a sentence of alternative release unavailable, the trial court nonetheless noted that the following three statutory justifications for imposing confinement applied: (a) that confinement was necessary to protect society by restraining a [defendant] who has a long history of criminal conduct; (b) that confinement was necessary to avoid depreciating the seriousness of the offense, or confinement is particularly suited to provide an effective deterrence to others likely to commit serious offenses; and © that measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. See T.C.A. § 40-35-103(a)-© (2006).

Finally, the trial court found that the Defendant's attitude during trial and sentencing was "totally offensive" and that the continued dishonesty regarding his finances and disrespect toward the court was "consistent with his total arrogance that he showed the whole judicial system every time [he was in court]."

### E. Motion for New Trial

The Defendant filed a timely motion for new trial, wherein the Defendant alleged that the Monroe County Sheriff's Department seized letters written before trial by the Defendant to his trial attorneys, and the Defendant argued that this disruption of his communication with his attorneys resulted in unreasonable delay in bringing him to trial outside the Interstate Compact period. A hearing was held on this motion wherein the following proof was presented: The parties agreed that Detective Pat Henry of the Monroe County Sheriff's

14

Department seized letters written by the Defendant while he was incarcerated in the Monroe County jail. The Defendant had been assisting Detective Henry in the investigation of an unrelated Monroe County homicide. Photocopies of these sealed envelopes were entered into evidence. The letters included: one letter to Monroe County Sheriff's detective Pat Henry; three letters to the FBI; two letters to the ATF; one letter to the warden of the Arizona State Prison; one letter to an attorney in Arizona, Steven J.A. August; and one letter to an attorney in Athens, Tennessee, Randy Rogers. The letter to the Arizona attorney was dated January 27, 2009, and the letter to the Tennessee attorney was dated February 4, 2009.

Monroe County Sheriff Bill Bivens testified that, after Detective Henry retired, another officer was cleaning out Detective Henry's office and found the letters the detective had apparently intercepted from the Defendant. The sheriff testified that his office immediately handed over the letters to the District Attorney General's Office. Sheriff Bivens could not recall the date he gave possession of the letters to the District Attorney General's Office. He did not remember whether this occurred before or after the Defendant's trial in this case.

Tennessee Bureau of Investigation Agent Jason Legg testified that he investigated the incidents of mail interception at the Monroe County jail. He determined that Detective Henry had been writing letters to the Defendant from the "Law Office of Paul Harris" in which Detective Henry represented himself to be an attorney.

Captain Pat Wilson of the Monroe County Sheriff's Department testified that all outgoing and incoming mail to inmates was logged on a computer system. He said the computer log reflected only four of the eleven letters sent by the Defendant.

The Defendant requested that the trial court open and consider the content of the intercepted letters to Tennessee attorney Randy Rogers and Arizona attorney Steven August. The trial court refused this request and denied the Defendant's motion for new trial. This timely appeal ensued.

## II. Analysis

On appeal, the Defendant contends: (1) the trial court improperly denied his motion to dismiss for failure to comply with the Interstate Compact on Detainers; (2) the trial court improperly denied his request for severance ; (3) the trial court improperly denied his motion for a mistrial based on the State's introduction of evidence of the Defendant's other crimes; (4) the trial court improperly refused to strike the State's "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions"; (5) the trial court improperly refused to excuse six jurors who had media knowledge of other crimes the Defendant allegedly

committed; (6) the trial court improperly allowed the State to re-call witness A.J. Smith in order to prove venue; (7) the State failed to prove venue; (8) the trial court failed to properly instruct the jury; (9) the evidence was insufficient to support his convictions; (10) the State failed to comply with Tennessee Rule of Criminal Procedure 16 when it failed to provide the Defendant's trial counsel with letters written by the Defendant and intercepted by the Monroe County Sheriff's Department; and (11) the trial court erred when it sentenced him. We address each contention in turn.

## A. Compliance with Interstate Compact on Detainers

As his issue on appeal, the Defendant contends that, because the State failed to try him within 180 days of its receipt of his Interstate Compact request, the State was without jurisdiction to prosecute this case, and his convictions should be reversed. Due to the complex nature of the Interstate Compact's provisions and, as a result, that of the parties' arguments, we first describe the Interstate Compact before describing in more detail the parties' arguments.

The Interstate Compact on Detainers is a uniform agreement, adopted by forty-eight states including Tennessee, which facilitates the interstate transfer of a prisoner for the purpose of disposing of the prisoner's pending out-of-state criminal charges, which may preclude the prisoner from early release consideration or alternatives to confinement. *See* T.C.A. § 40-31-101, *et seq.* (2006); *Nelms v. State*, 532 S.W.2d 923, 927 (Tenn. 1976). The stated purpose of the Interstate Compact is "to encourage the expeditious and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." T.C.A. § 40-31-101, art. I. This Court is to construe the provisions of the Interstate Compact liberally in favor of the defendants it was intended to protect. *Garmon*, 972 S.W.2d at 710. Its protections, however, are statutory, rather than constitutional or jurisdictional. *Id.* (citing *Grizzell v. Tennessee*, 601 F. Supp. 230 (M.D. Tenn. 1984)).

Describing the interaction of the "sending" state in which a defendant is incarcerated and the "receiving" state that has lodged a detainer against a defendant, the Interstate Compact provides a process whereby the prisoner may demand that the receiving state dispose of charges relating to detainers lodged against the defendant by the receiving state during his temporary transfer to the receiving state. T.C.A. § 40-31-101, art. III(a)-(f). This demand, if carried out according to the procedure set out in the Interstate Compact, obliges the receiving state to try the defendant within 180 days or else forfeit prosecution of not only the charges underlying the detainer but also any other charge arising from the same criminal transaction. T.C.A. § 40-31-101, art. III(a); art. V(d). The 180-day period begins to run on the date the petition is received by the court and district attorney in the county where the

charges are pending. *State v. Moore*, 774 S.W.2d 590, 593 (Tenn. 1989).

Further, once the defendant has been temporarily transferred under the Interstate Compact to the receiving state, return of the prisoner to the sending state permanently bars the receiving state from prosecuting those charges, regardless of whether 180 days have passed. T.C.A. § 40-31-101, art. III(d). A defendant's failure to object to a date for a trial set beyond the 180-day period precludes the prisoner from later arguing that the Interstate Compact bars prosecution of the charges. *State v. Garmon*, 972 S.W.2d 706, 710 (Tenn. Crim. App. 1998).

The 180-day period in which the State must try the defendant is not absolute; rather, it is subject to the trial court's ability to grant "any necessary or reasonable continuance" for "good cause shown":

> [Once a person has triggered the Compact's protections by causing both the State and the trial court to receive a copy of his Compact request,]the person shall be brought to trial within one hundred eighty days, . . . provided, that for good cause shown in open court, the prisoner or the prisoner's counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

T.C.A. § 40-31-101, art. III(a). Neither a crowded docket nor the State's negligence constitutes "good cause" for a delay. *State v. Gipson*, 670 S.W.2d 637 (Tenn. Crim. App. 1984); *State v. Green*, 680 S.W.2d 474 (Tenn. Crim. App. 1984), *overruled on other grounds by Stave v. Moore*, 774 S.W.2d 590 (Tenn. 1989). Also, delay "occasioned by the defendant" tolls the running of the180-day period. *State v. Dillon*, 844 S.W.2d 139, 142 (Tenn. 1992).

Tennessee courts have discussed the circumstances under which pre-trial delay is "occasioned by the defendant" or, alternately, necessitated by "good cause." *See Dillon*, 844 S.W.2d at 142. In *State v. Bobo*, we held that "good cause" for delay existed, in general, where the State did not act in bad faith or fail to exercise due diligence and "[t]he defendant's actions contributed to a substantial part of the delay." *State v. Bobo*, 724 S.W.2d 760, 763 (Tenn. Crim. App. 1981). In *State v. Marlow Williams*, we held that where the defendant's counsel had a conflict of interest, and trial was continued for twenty-eight days in order for new counsel to be appointed, the delay was a "reasonable and necessary continuance." No. W2005-02803-CCA-R3-CD, 2007 WL 2781720, *5 (Tenn. Crim. App., at Jackson, Mar. 6, 2007), *perm. app. denied* (Tenn. Apr. 7, 2008). In *Williams*, this Court also held that the unavailability of a witness was "good cause" justifying a delay in bringing a defendant to trial under the Interstate Compact. *Id.* at *6. In *Dillon*, our supreme court held that delay caused by pre-trial motions brought by the defendant are excluded from the time computation

17

under the Interstate Compact. 844 S.W.2d at 142; *see Hershel Clark v. State*, No. 02C01-9112-CR-00273, 1993 WL 188052, *8 (Tenn. Crim. App., at Jackson, June 2, 1993) (holding that delay requested by the defendant in order to obtain medical/scientific proof was "occasioned by the defendant"), *no Tenn. R. App. P. 11 application filed*.

The Defendant contends the trial court erred when it refused to dismiss the charges in this case before trial based on the State's failure to try him within the 180-day period mandated by the Interstate Compact on Detainers. In essence, he argues that, because the actions of the trial judge and the State's attorney delayed his trial, the reasons for the delay were not attributable to him and did not constitute "good cause for delay." *See State v. Garmon*, 972 S.W.2d 706, 709 (Tenn. Crim. App. 1998).

Regarding the first delay, the trial court's suspension of proceedings from the Defendant's November 17, 2008, arraignment to January 26, 2009, in order for the Defendant to retain private counsel, the Defendant argues that this delay was not attributable to him because his claim of having "multi-millions" in Malaysian bank accounts did not amount to a request to be allowed to retain private counsel. He further argues that the Monroe County Sheriff's Department's interception of his attorney communication interfered with his ability to retain counsel and, thereby, augmented the State's responsibility for the delay of his trial.

The State responds that the Defendant's claim of vast financial resources precluded the trial court from appointing counsel for the Defendant and that, as such, the two-month period the trial court gave the Defendant to retain private counsel was "attributable to the Defendant."

Regarding the second delay, the trial court's grant of a continuance on the eve of the original trial date for the State to transport witness Jamie Turpin from Canada, the Defendant argues this delay was due to the State's negligence and, thus, was not a "necessary or reasonable continuance" for "good cause shown." *See* T.C.A. § 40-31-101, Art. III; *Garmon*, 972 S.W.2d 706, 710 (Tenn. Crim. App. 1998).

In response, the State draws this Court's attention to its previous holding that the unavailability of a witness is "good cause" justifying a delay in bringing a defendant to trial under the Compact. Given the trial court's finding that the State sought the continuance in "good faith" because witness Turpin was not yet available to testify due to the necessity of acquiring a passport in order to travel to the United States, the State argues that the continuance, which resulted in a fifty-day delay, was "necessary or reasonable."

The Defendant also argues the delay of his trial past his original trial date, which was within the 180-day time period enumerated by the Interstate Compact, prejudiced him in that

18

it gave the State the opportunity to file a "Notice of Intent to Seek Enhanced Punishment," which it had not filed before his original trial date. In his reply brief, the Defendant argues that witness Turpin's testimony at trial established that she heard of the charges against the Defendant only five days before his June 2009 trial. He contends, based on this testimony, that the State did not actually try to transport witness Turpin until one week before the Defendant's April trial and that, as such, the State's request for a continuance was a result of its negligence and not made in "good faith."

Our review of the record shows that the State and the Monroe County Clerk's Office had both received the Defendant's request for final disposition of his pending Monroe County charges by October 10, 2008. Thus, the 180-day period during which the State could lawfully prosecute the Defendant in this case commenced on October 10, 2008. Thus, were there no circumstances that tolled this period, the period in which the Defendant could be tried would have expired on April 8, 2009.

Reviewing the record, there appear to be two circumstances that delayed the Defendant's trial. First, when questioned during his arraignment about his financial resources, the Defendant claimed to possess vast financial resources in the form of foreign bank accounts and high-value commercial vehicles. The trial court refused to appoint the Defendant an attorney in light of this information and scheduled a status hearing to take place in two months in order for the Defendant to obtain counsel. During this period, the Monroe County Sheriff's Department intercepted several letters the Defendant wrote to attorneys. When the Defendant appeared at the status hearing, he had not yet hired an attorney. He filled out an affidavit upon which he again claimed to have vast financial resources, including multiple vehicles. After expressing a lack of belief that the Defendant's claims were truthful, the trial court appointed counsel and set trial, at the State's request, for February 2009.

When the parties reconvened in February, another complicating factor arose. The Defendant and his appointed counsel appeared as ordered at the hearing and stated their willingness to proceed to trial on that day. The State, however, requested more time to transport witness Jamie Turpin from Canada. The trial court granted the State a continuance in order for it to transport witness Turpin from Canada. During this hearing, defense counsel objected to continuing the proceedings, drawing the court's attention to the running of the 180-day period in which the Defendant could be tried. The trial court granted the State's motion and set a status hearing update for April 13, 2009, and a trial date for April 14, 2009. In March 2009, the State filed its "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions," and on April 9, 2009, defense counsel moved the trial court to dismiss the charges against his client based on the State's failure to try the Defendant within 180 days. The trial court denied the motion to dismiss, and the Defendant's trial took

19

place on April 16, 2009.

We conclude both reasons for the delay of the Defendant's trial constitute "good cause" within the meaning of the Interstate Compact. First, the Defendant "occasioned" the first delay of two months by representing to the trial court that he had sufficient funds to hire his own attorney. Based on this representation, the Defendant did not meet the requirements to have an attorney appointed for him, so the trial court declined to do so and gave the Defendant an opportunity to retain an attorney with the funds that he purported to possess. The trial court properly relied upon the Defendant's claims when it required him to hire counsel. As such, we conclude that the trial court's first delay of the proceedings in order for the Defendant to obtain private counsel was for "good cause" within the meaning of the Interstate Compact because it was "occasioned" by the Defendant's claim of financial resources that obligated the trial court to require the Defendant to pay for his own attorney. *See Dillon*, 844 S.W.2d at 142.

The interception of the Defendant's letters, which is addressed later in the opinion, did not contribute to the delay of proceedings because, even had the Defendant appeared with privately retained counsel at the January 2009 attorney status hearing, the State was not prepared for trial on this date, as its request for a continuance at the February hearing revealed. Thus, even had private counsel appeared for the Defendant at his January hearing, the Defendant's case would not have proceeded to trial until April 16, 2009. As such, we conclude that the interception of the Defendant's attorney communications did not further delay the Defendant's trial and, as such, is not relevant to his claim that he was not tried in compliance with the Interstate Compact.

We further conclude that the trial court had "good cause" to delay the trial again when the State informed the trial court that it could not transport witness Turpin from Canada in time for the trial. We first note that the State had limited time in which to procure the witness, in part because the parties were attempting to set the trial date between January 26, 2009, the date that the Defendant's attorney was appointed, and April 8, 2009, the date that his 180-day time expired. The fact that the State had limited time in which to transport witnesses, therefore, is again attributable to the Defendant's delay of the proceedings by insisting that he was not indigent. *See Dillon*, 844 S.W.2d at 142.

Further, contrary to the Defendant's interpretation of the record, our review of the record does not indicate that witness Turpin testified the State contacted her in connection with this case only one week before trial. Witness Turpin simply testified, "[T]he first time that [the State] told me about [the checks] was on the phone last week." This testimony alone establishes neither that the State contacted witness Turpin for the first time only a week before trial nor that the State was not already engaged in arranging for witness Turpin's

travel before it spoke with her on this occasion. Therefore, in our view, the record does not support the Defendant's assertion that the State's February 2008 request for a continuance in order to transport witness Turpin from Canada was in bad faith or that it failed to exercise due diligence in transporting witness Turpin. As such, we conclude that the second reason for delay was for "good cause" shown. *See Williams*, 2007 WL 2781720, *5.

In summary, the Defendant's actions contributed to a substantial part of the delay of his trial, and the State's request for a continuance was not in bad faith or the result of a lack of diligence. Taking these considerations into account, we conclude that "good cause" existed for the delay of the Defendant's trial beyond the 180-day period contemplated by the Interstate Compact. *See Bobo*, 724 S.W.2d at 760. Because the Defendant's prosecution in this case did not violate the Interstate Compact, the trial court properly denied the Defendant's motion to dismiss. The Defendant is not entitled to relief on this issue.

## B. Severance of Counts Related to Loudon County

The Defendant argues the trial court erred when it denied his motion to sever the counts of the Indictment that concerned checks he passed to Mr. Poe from the counts that concerned checks he passed to Mr. Smith. The Defendant argues that, because he passed the checks to Mr. Poe more than one month before he passed the checks to Mr. Smith, and the events were not otherwise related, his interaction with each man was not a "common plan or scheme." He also contends that the trial court erred by denying his motion to sever without considering whether evidence of Counts One through Four would be admissible in the trial of Counts Five through Eight. The Defendant argues that, because no evidence of his conduct with respect to the checks he gave Mr. Poe would have been "relevant to a material issue" in the trial of his charges relating to the checks he gave Mr. Smith, evidence of Counts One through Four would not be admissible in the trial on Counts Five through Eight. He asserts he was entitled to severance not only because his actions with respect to Mr. Poe and Mr. Smith were not part of a common scheme or plan but also because evidence of his actions with respect to one gentleman would not be admissible in the trial on his charges relating to the other. He contends the trial court abused its discretion in refusing to sever the counts and that he was severely prejudiced by this refusal because the jury heard evidence supporting Counts One through Four, although the counts ultimately were dismissed for failure of venue.

The State responds that the trial court did not abuse its discretion when it denied severance because, as the trial court found, the Defendant's conduct with respect to each man occurred with close temporal proximity and proof of each part of his conduct would be "intermingled."

The issue of whether the Defendant is entitled to relief based upon the consolidation of the counts in this case involves several inquiries.  First, we must determine whether the trial court undertook the correct procedures and applied the correct legal standards when it disposed of the Defendant's motion to sever.  Second, we must determine whether, under an application of the correct legal standards, the Defendant was entitled to a severance.  Finally, we must determine whether any error made by the trial court when it denied a severance was harmless.

We review a trial court's denial of a motion for severance for an abuse of discretion.  *See State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).  As such, a trial court's refusal to sever offenses will not be reversed unless the court applied an incorrect legal standard, reached an illogical conclusion, based its ruling on a clearly erroneous standard assessment of the proof, or applied reasoning that caused injustice to a complaining party.  *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010).  Also, a trial court abuses its discretion when it fails to consider the factors provided by a higher court as guidance for determining a particular issue.  *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007).

### 1. Trial Court's Procedure & Legal Analysis

Tennessee Rules of Criminal Procedure 8 and 13(a) allow for the consolidation of two or more indictments where the offenses either are part of a "common scheme or plan" or are of the "same or similar character."  However, under Tennessee Rule of Criminal Procedure 14(b)(1), a defendant "shall have a right" to a severance of offenses that have been consolidated unless: (1) the offenses are "part of a common scheme or plan"; and (2) "the evidence of one would be admissible upon the trial of the others."  When a defendant seeks a severance, the burden is on the State to show that the offenses should not be severed.  *State v. Denton*, 149 S.W.3d 1, 13 (Tenn. 2004).

"[I]rrespective of whether a defendant formally moves for severance or whether a defendant merely objects to the [S]tate's pre-trial motion for consolidation, the issue properly preserved is one of severance," which we evaluate under Tennessee Rule of Criminal Procedure 14.  *Spicer v. State*, 12 S.W.3d 438, 444 (Tenn. 2000).  Thus, if a defendant objects to the consolidation of offenses that would otherwise be permissible under Rule 8(b), the offenses may not be tried together unless the two criteria listed in Rule 14(b)(1) are present: (1) "the offenses are parts of a common scheme or plan"; and (2) "the evidence of one would be admissible in the trial of the others."  The primary issue is whether "evidence of one offense would be admissible in the trial of the other if the two offenses remained severed."  *Id*. at 445 (citing *State v. Burchfield*, 664 S.W.2d 284, 286 (Tenn. 1984)).  Thus, "[i]n its most basic sense, . . . any question as to whether offenses should be tried separately

pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" *Id*. (citing *State v. Moore*, 6 S.W.3d 235, 239 (Tenn. 1999)).

In order to determine whether "evidence of one [offense] would be admissible in the trial of the other," a trial court, in essence, must determine whether proof of a defendant's alleged bad act may be admitted in his trial for another alleged bad act. *See State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). Thus, this determination implicates Tennessee Rule of Evidence 404(b), which bars the admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." Rule 404(b)'s purpose is to avoid "the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt of the specific charge." *Id*. Given that this risk of unfair prejudice is even higher where the defendant's bad act is similar to the crime for which the defendant is on trial, "any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the Defendant." *State v. Garrett*, 331 S.W.3d 392, 403 (Tenn. 2011).

In summary, a trial court must determine that the following three things are true in order to deny a defendant's motion for severance:

> (1) the multiple offenses constitute parts of a common scheme or plan, Tenn. R. Crim. P. 14(b)(1); (2) evidence of [one] offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); *Moore*, 6 S.W.3d at 239; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant, Tenn. R. Evid. 404(b)(3).

*Spicer*, 12 S.W.3d at 445. The State bears the burden of producing evidence to establish the existence of these three circumstances. *State v. Toliver*, 117 S.W.3d 216, 228 (Tenn. 2003). In order to determine whether the State has met its burden of production, the trial court "must" hold a hearing. *Garrett*, 331 S.W.3d at 403. This hearing requirement is "well established," and it ensures that an appellate court will have an adequate record upon which to review the trial court's denial of severance. *Id*. Normally, because a trial court determines whether to consolidate offenses based on the evidence presented at the hearing, "appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses." *Garrett*, 331 S.W.3d at 403. However, where no hearing is conducted or where evidence is not otherwise available to a trial court disposing of a motion for severance, an appellate court's analysis "necessarily requires review of the

evidence at trial."[4]  *Toliver*, 117 S.W.3d at 228, fn.4 (reviewing trial evidence where proceedings on severance issue were "shortened" due to issue being raised only shortly before trial); *Garrett*, 331 S.W.3d at 404 (reviewing trial evidence where no hearing was conducted on severance issue).

Before trial in this case, the Defendant orally moved for severance of the charges in the indictment.  The State introduced no evidence but argued that all of the alleged conduct occurred within the same twenty-four hour period and that, as such, the conduct was part of a "common scheme or plan."  The trial court found that "based on what [it had] heard of the evidence so far," the alleged crimes occurred within one day of each other and that "it is the kind of thing that the State can proceed on [in] one indictment as one set of factual situations."  The trial court also found that "a lot of the facts are going to be intermingled as far as who did what and who said what and where things happened."  The trial court denied the Defendant's request for a severance.

We conclude that the trial court's legal analysis was incomplete when it disposed of the Defendant's motion to sever.  The trial court rejected the Defendant's request for severance based largely on its conclusion that the Defendant's alleged conduct constituted "part of a common scheme or plan."  Although the trial court noted that "a lot of the facts are going to be intermingled as far as who did what and who said what and where things happened," this analysis falls short of the analysis necessary to determine whether "the evidence of one would be admissible in the trial of the others."  This analysis requires the trial court to determine whether, if the counts remained severed, Rule of Evidence 404 would allow the introduction of evidence of one set of conduct during his trial for the other.  *See Spicer*, 12 S.W.3d at 444.

## 2. Whether Severance was Necessary under Rule 14(b)(1)

In light of the trial court's incomplete analysis of the Defendant's request for a severance, we must determine, pursuant to a complete analysis under Tennessee Rule of Criminal Procedure 14(b)(1), whether the Defendant was entitled to severance. Because the hearing on the Defendant's motion to sever was cursory and because the State failed to produce any evidence in support of its assertion that the Defendant's conduct was part of a "common scheme or plan," we analyze the severance issue based on the evidence introduced at trial.  *See Toliver*, 117 S.W.3d at 228.

[4]As a caveat, we note that, where offenses are alleged in an open-date indictment, the State may not rely on the evidence introduced at trial to meet its burden of production, and "this Court will not look to such evidence to determine whether consolidation was proper."  *Spicer*, 12 S.W.3d at 447.

Based upon the evidence introduced at trial, the counts regarding Mr. Poe as the victim occurred in Loudon County, rather than Monroe County, where the indictment was returned and the trial was held. Accordingly, the State agreed to dismissal of these four counts with prejudice. It is worth noting that had the State requested the trial court to properly follow the procedures mandated for severance hearings, the venue issue might have come to light before a trial. Implicit in the State's agreement that the "Poe counts" should be dismissed with prejudice is the fact that none of the elements of the crimes alleged occurred in Monroe County. Therefore, absent a waiver of venue by the Defendant, the "Poe Counts" could not be tried in Monroe County without violating the Defendant's rights guaranteed in Article I, section 9 of the Constriction of Tennessee. (Among the rights of the accused in a criminal prosecution is the right to a public trial" by an impartial jury of the county in which the crime shall have been committed.") Therefore, even if factors exist which would normally justify consolidation of offenses or denial of a motion to sever offenses if venue of one or more offenses is not in the county where the indictment is returned, consolidation of that offense(s) would never be proper absent a defendant's waiver of venue.

Accordingly, based upon the evidence we must review, under the particular facts of this case, we have no choice but to conclude that the trial court erred by denying the motion for severance. Thus, we must analyze the issue of whether the error was harmless error. In addition, in case of further review, we will address the issue as if venue for the "Poe Counts" was in Monroe County.

As discussed above, consolidation of charges is only proper where: (1) "the multiple offenses constitute parts of a common scheme or plan"; (2) "evidence of [one] offense is relevant to some material issue in the trial of all the other offenses"; and (3) "the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant." *Spicer*, 12 S.W.3d at 445.

We first consider whether each of the offenses listed in the indictment were "part of a common scheme or plan." Three types of "common scheme or plan" relationships exist: (1) "offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes"; (2) "offenses that are part of a larger, continuing plan or conspiracy"; and (3) "offenses that are all part of the same criminal transaction." *Shirley*, 6 S.W.3d at 248. First, a series of crimes are considered "signature" where they involve a *modus operandi* "so unique and distinctive" with "such unusual particularities" that a reasonable person would conclude that a different person would not likely commit the crimes in the manner in which they were committed. *Moore*, 6 S.W.3d at 240. Second, offenses are "part of a larger, continuing plan or conspiracy" where they are directed at a "common goal or purpose." *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), *overruled on other grounds by*

25

*Spicer*, 12 S.W.3d at 447. Proof of a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial is essential to establish the existence of a "larger, continuing plan or conspiracy." *Id*. Finally, to be part of the "same criminal transaction," the crimes must occur "within the same criminal episode." *Id*.

The continuing plan or conspiracy category "has typically been restricted to cases involving crime sprees, where the defendant commits several crimes quite closely in time to one another." *Id.* (citing *State v. Hall*, 976 S.W.2d 121, 146 (Tenn.1998) (appendix)). *See generally Hall*, 976 S.W.2d 146 (appendix) (joinder of trials for burglaries, larcenies, and murder proper where defendants committed offenses following escape from prison; larger plan was to flee the country and avoid capture); *State v. William Arthur Shelton*, No. E2005-02014-CCA-R3-CD, 2006 WL 3246100, at *4 (Tenn. Crim. App., at Knoxville, Nov. 9, 2006) (joinder of kidnapping, vandalism, and murder trials proper where defendant detained occupants of a residence in an attempt to lure murder victim to the residence; defendant also vandalized car to prevent kidnapping victims from escaping), app. denied (Tenn.2007); *State v. William Ramsey*, No. M2001-02735-CCA-R3-CD, 2003 WL 21658589, at *9 (Tenn. Crim. App., at Nashville, July 15, 2003) (joinder of aggravated robbery and theft offenses occurring four months apart proper where defendant committed offenses in attempt to retaliate against victim, who had abused former codefendant's stepsister); *State v. Mario Antoine Leggs*, No. M2002-01022-CCA-R3-CD, 2003 WL 21189783, at *5 (Tenn. Crim. App., at Nashville, May 21, 2003) (joinder of multiple offenses including aggravated robbery, reckless aggravated assault, and theft proper where defendant, over a three-week period, stole several women's purses in the parking lot of a particular store at a particular mall; "offenses were part of a larger, continuing plan to steal women's purses" at that particular location).

In this case, Counts One through Four of the Indictment charged the Defendant with committing one count of forgery and one count of criminal simulation on February 18, 2008, and one count of forgery and one count of criminal simulation on February 19, 2008. Counts 5 through 8 charged the Defendant with forging two additional checks and committing two additional counts of criminal simulation on February 19, 2008. In the proceedings leading up to trial, the State indicated Counts One through Four were based on checks written to David Poe, and Counts Five through Eight were based on checks written to A.J. Smith.

At trial, Mr. Poe testified that the Defendant wrote him two checks, one for $2,000,000 and another for $175,000, and that each of these checks was intended to cover expenses related to the dairy farm they intended to operate together on the land the Defendant

planned to purchase from Mr. Smith. The $2,000,000 check was dated February 18, 2008,[5] and the $175,000 check was dated February 19, 2008.[6] In February 2008, the Defendant approached Mr. Smith with an offer to buy Mr. Smith's land, saying he wished to buy the land for his wife, who admired the property. Within a week, the Defendant and Mr. Smith agreed that the Defendant would buy Mr. Smith's property for $25,000,000. Mr. Smith confirmed that, a week or so after the Defendant initially contacted him, the Defendant gave him a $27,000,000 check dated February 19, 2008. The next day, the Defendant gave him a $250,000 check, also dated February 19, 2008. The evidence proved that the Defendant contacted Mr. Smith a week before writing him the checks and that he was also negotiating with Mr. Poe during over this same time period.

The trial court denied severance, finding that "the State can proceed on one indictment as one set of factual situations" and that "the facts are going to be intermingled as far as who did what and who said what and where things happened." We infer that the trial court found that the crimes were part of a common scheme or plan. We agree. The evidence proved that the Defendant intended to fraudulently obtain land upon which he could live and operate a dairy farm. In pursuit of this goal, the Defendant used Jamie Turpin's credit card checks, which he altered from "Ms. Jamie Turpin" to "Mr. Jamie Turpin" to procure land upon which to operate a dairy farm. He wrote two checks dated February 19, 2008, to purchase the land. On February 18 and 19, he wrote two similar checks to cover the operating expenses of the dairy farm he intended to operate on the land. We find that this set of facts shows that the Defendant was acting with the "common goal or purpose" of fraudulently acquiring and

----

[5]On the checks written to Mr. Poe, copies of which accompany the record in this case, a shaded area printed with "DD/MM/YYYY" appears in the upper right-hand corner. On the $2,000,000 check, this space has been filled with the handwritten numbers "18/02/2008." The Defendant argues in his brief, however, that the record shows that the $2,000,000 check to Mr. Poe was written on January 8, 2008. Our review of the record reveals the source of this confusion. During his testimony, Mr. Poe was asked to read the date that appeared on the front of the check. Mr. Poe, in error, read aloud "18/02/0008." Next, the State asked Mr. Poe whether this date represented "February 18, 2008," but Mr. Poe responded, "January the 8th." The State continued with its examination without commenting on or resolving this contradiction. In our view, Mr. Poe likely read only the first two digits of the numerical sequence and ignored or overlooked the first "2" appearing on the check. In keeping with the customary method of dating in the U.S., Mr. Poe then testified that the check reflected a date of "January 8th." Mr. Poe did not account for and likely was unaware of the fact that, in Canada, where this check originated, the month and year are commonly transposed when writing dates. Because Mr. Poe's testimony that the check was written on January 8 was based upon his interpretation of the date written on the check rather than his independent recollection of when the Defendant wrote the check, we are satisfied that the evidence establishes that the check was written on February 18, 2008.

[6] As mentioned above, the counts based on the checks Mr. Poe received were dismissed with prejudice after Mr. Poe testified that he actually received the checks in Loudon County, which precluded the District Attorney in Monroe County from prosecuting charges based on the checks.

operating a dairy farm.

Because we have so concluded, we turn to address whether "evidence of [one] offense is relevant to some material issue in the trial of all the other offenses" and whether "the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant." *Spicer*, 12 S.W.3d at 445. The second prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure requires that "the evidence of one [of the offenses would] be admissible in the trial of the other[s]." T. R. Crim. P. 14(b)(1). We conclude that, in fact, the evidence of each offense would have been admissible at the trial of the other to show proof of the Defendant's fraudulent intent. The Defendant's intent was a material and contested issue at trial. *See e.g., State v. Roger Knoblock*, No. E2004-01961-CCA-R3-CD, 2005 WL 1968444, (Tenn. Crim. App., at Knoxville, Aug. 16, 2005), *no Tenn. R. App. P. 11 application filed*. We further conclude that the probative value of the offenses was not outweighed by the prejudicial effect that the admission had upon the Defendant. Accordingly, the trial court's error in denying the motion to sever was harmless error. The Defendant is not entitled to relief on this issue.

### C. Mistrial Based upon Introduction of Mr. Poe's Testimony

The Defendant contends the trial court erred when it refused to grant a mistrial based upon the State's introduction of Mr. Poe's testimony about the crimes alleged in Counts One through Four, which were dismissed after the trial court determined the alleged crimes occurred in Loudon County. He argues that, because this evidence was not relevant to any issue in his trial on the Monroe County crimes, the evidence constituted propensity evidence barred by Tennessee Rule of Evidence 404. He argues the evidence of his Loudon County conduct particularly prejudiced him because the crimes alleged to have occurred in Loudon County were similar to the Monroe County crimes for which the Defendant was being tried. The Defendant contends that Mr. Poe's testimony prevented the jury from reaching an impartial verdict and, thereby, created the "manifest necessity" of granting a mistrial. As a result, he argues the trial court abused its discretion when it refused to grant a mistrial based on Mr. Poe's testimony.

The State responds that the trial court did not abuse its discretion in denying a mistrial. It argues that, because the State introduced Mr. Poe's testimony to support Counts One through Four rather than to show "other acts," which Rule 404 would bar, the trial court correctly determined a mistrial was unnecessary because the evidence indeed supported the charges alleged in Counts One through Four.

The decision on whether to grant a mistrial lies within the sound discretion of the trial court. *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994). We will not interfere with the trial

28

court's decision to refuse to grant a mistrial "absent clear abuse appearing on the face of the record." *State v. Burns*, 979 S.W.2d 276, 293 (Tenn. 1998). In determining whether to grant a mistrial, the trial court would determine "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached . . . ." *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Additionally, this Court has stated that a mistrial should be declared if there will be a miscarriage of justice if it were not. *See Burns*, 979 S.W.2d at 293; *State v. Allen*, 976 S.W.2d 661, 668 (Tenn. Crim. App. 1997).

When determining whether a mistrial is necessary after a witness has injected improper testimony, this Court has often considered the following factors: (1) whether the improper testimony resulted from questioning by the State or whether it was a gratuitous declaration; (2) the relative strength or weakness of the State's case; and (3) whether the trial court promptly gave a curative instruction. *See State v. Paul Hayes*, No. W2001-02637-CCA-R3-CD, 2002 WL 31746693, at *4 (Tenn. Crim. App., at Jackson, Dec. 6, 2002), *perm. app. denied* (Tenn. May 27, 2003).

At trial, Mr. Poe testified he knew the Defendant as "Jamie Turpin" and that he and the Defendant, who was married to Mr. Poe's daughter, planned to open a dairy farm. Mr. Poe testified that, in connection with this plan, the Defendant gave him one check for $2,000,000 and another check for $250,000, both of which were written on the account of "Jamie Turpin." To the surprise of both parties, Mr. Poe testified that the Defendant gave him these checks in Loudon County. After it was determined that the Monroe County District Attorney's Office lacked jurisdiction to prosecute the Defendant for the checks he wrote to Mr. Poe, the trial court dismissed Counts One through Four of the indictment with prejudice. The Defendant immediately objected to the introduction of Mr. Poe's testimony, and the trial court issued a curative instruction to the jury. The trial court said, "Whatever's alleged to have occurred that did not occur in [Monroe County], I would instruct you at this time you should disregard any testimony from this witness about any check in Loudon County. Whether or not that check exists is not a matter for your concern in this trial." The Defendant moved for a mistrial based on the introduction of Mr. Poe's testimony about the Defendant's conduct supporting Counts One through Four. The trial court denied this motion without issuing additional findings.

The testimony of Mr. Poe was not introduced as propensity evidence. It was introduced to prove the crimes charged in Counts One through Four in the indictment. It was only after Mr. Poe testified that the Defendant's conduct that was the basis for Counts One through Four occurred in Loudon County, apparently to the surprise of all, that the testimony became evidence of alleged criminal conduct by the Defendant that the Monroe County jury was no longer *required* to consider as part of the trial evidence. Due to these unique circumstances, the ususal Tennessee Rule of Evidence 404(b) procedures for dealing with

29

evidence of other crimes was not followed.  In our view, however, the trial court did not abuse its discretion in denying the Defendant's motion for a mistrial.

As previously stated, the trial court's determination not to sever Counts One through Four from the remaining counts of the indictment was harmless error.  Because we concluded that the evidence in Counts One through Four was admissible at trial as part of a common scheme or plan with Counts Five through Eight, the "error" only arose when the venue issue arose.  The State elicited Mr. Poe's testimony to prove the charges against the Defendant in Counts One through Four, not as propensity evidence.  The proof of the Defendant's guilt in Counts Four through Eight was strong.  Finally, the trial court issued an appropriate curative instruction.  Because the record does not suggest that Mr. Poe's testimony resulted in a miscarriage of justice, we will not reverse the trial court's refusal to grant a mistrial. The Defendant is not entitled to relief on this issue.

### D. Motion to Strike the State's "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions"

The Defendant contends the trial court erred when it denied his motion to strike the State's notice of its intent to use the Defendant's prior convictions to impeach him and to seek an enhanced sentence.  He argues that the State's notice was not timely filed because it was filed after the original trial date, when the State obtained a continuance in order to transport witness Jamie Turpin from Canada.  The Defendant argues the State's negligence in arranging for the transportation of Turpin made this continuance necessary.  He argues that, by refusing to strike the State's notice of its intent to impeach the Defendant and seek enhanced punishment based upon the Defendant's prior convictions, the trial court "rewarded" the State with ample time to file pre-trial motions that he argues the State waived by failing to file before the original trial date.

The State responds that the trial court did not err when it denied the Defendant's motion to strike the State's notice of its intent to seek enhanced punishment because the Defendant had "reasonable written notice" of the State's intent before his April 14, 2009, trial and because the trial court conducted a hearing to weigh the probative value of the evidence against its prejudicial effect.

Tennessee law requires the State provide written notice not less than ten days before trial to a defendant that the State intends to seek enhanced punishment if the defendant is convicted.  T.C.A. § 40-35-202(a) (2009).  The notice must be given at least ten days before trial and should provide the types of convictions, dates of convictions, and identity of the courts of conviction.  *Id*.  The purpose of the statutory notice of intent to seek enhanced sentencing is: (1) to provide fair notice to an accused that he is exposed to other than

standard sentencing; (2) to inform decisions to enter a guilty plea; and (3) to aid trial strategy. *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990). "Notice is important not only in preparation for a sentencing hearing, but in evaluating the risks and charting a course of action before trial." *Id*. A defendant waives any objection to a late-filed notice by not moving for a continuance after the late-filing. *State v. Stephenson*, 752 S.W.2d 80, 81 (Tenn. 1988). Further, a trial court is only precluded from enhancing a defendant's sentence based on prior convictions that were not the subject of a timely-filed notice by the State where the defendant demonstrates prejudice from the late filing. *Id*. Essentially, the notice statute requires "fair" rather than "perfect" notice. *State v. Taylor*, 63 S.W.3d 400, 413 (Tenn. Crim. App. 2001).

In this case, the Defendant's original trial was set to begin in February 2009. However, at the State's request, the trial was delayed to allow the State additional time to transport a witness from Canada. On March 23, 2009, the State filed its notice of intent to seek enhanced punishment and to impeach the Defendant based upon his prior convictions. The Defendant moved to strike the State's notice, but the trial court, finding that the notice was filed more than ten days prior to trial, denied the Defendant's motion and determined that the prior convictions would be admissible for impeachment and sentencing purposes.

The statute creates a duty on the part of the State to give "fair" notice to the Defendant that it intends to use his prior convictions at trial and sentencing. *Taylor*, 63 S.W.3d at 413. Thus, the State did not waive its ability to rely on the Defendant's convictions by not filing its notice before the original trial date in this case. Rather, when the Defendant's trial date shifted from February to April, the time frame for State's duty to provide notice likewise shifted. The State filed its notice of its intent to seek enhanced punishment on March 23, 2009, well over ten days before the Defendant's April 13, 2009, trial. Thus, the State fully complied with the notice requirement of section 40-35-202(a). Having determined the State filed a timely notice of its intent to use the Defendant's prior convictions, an inquiry into prejudice is unnecessary. We conclude that the trial court did not err when it denied the Defendant's motion to strike the State's "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions." The Defendant is not entitled to relief on this issue.

### E. Removal of Jurors for Cause

The Defendant argues the trial court erred when it refused to excuse "for cause" six jurors who had previous knowledge of the Defendant's criminal history. He argues that the jurors' exposure to his criminal history created "a substantial risk that his or her judgment [would] be affected." The Defendant argues the trial court erred when it allowed the six jurors he challenged "to remain on the panel." The State responds the trial court properly

31

refused to excuse the six jurors at issue for cause based upon its finding that all of the challenged jurors had satisfactorily testified that they could set aside what they had previously heard about the Defendant and base their decision for a verdict only on the evidence presented at trial.

During voir dire, six jurors acknowledged that they had heard or read information about the Defendant's prior or unrelated criminal conduct before being summoned for jury duty:

Juror Matthew West said that his friends at a local car dealership told him that the Defendant had "bought some cars" from the dealership but had thereafter disappeared. Juror West said, however, that "if the facts prove [the Defendant] innocent, you know, I could, I would agree with it."

Juror Hildegard McLemore said she had read in local newspapers that the Defendant had used checks that "bounced" to buy cars, but she "believe[d]" she could lay aside anything she learned about the Defendant before trial.

Juror Janice Millsaps said she had learned through "gossip" among other potential jurors that the Defendant had "embezzled" money. When asked whether she would "have any difficulty in returning a not guilty verdict if [she] felt the State didn't prove its case," Juror Millsaps responded, "Well, see, this is all new to me. I don't really know." After further discussion with Juror Millsaps regarding the State's burden of proof, the trial court asked the juror whether she would have "any hesitancy in returning a not guilty verdict" if she felt the State did not prove its case, Juror Millsaps responded, "Probably not."

Juror Cecilia Fadeley said that she had read and heard about the Defendant's case and specifically remembered reading the headline, "Con man having a jury," in reference to the Defendant. Regarding what she had heard about the Defendant, Juror Fadeley said, "I just remember him embezzling money from some people in Sweetwater and taking off with the daughter of the man." Juror Fadeley insisted, however, that she could base her decision as to the Defendant's guilt only on the evidence presented at trial.

Juror Grady Butler said that he had heard through rumors "something about somebody kidnapped a lady and took her to Canada or something like that" and that he associated the Defendant's name with this incident. Juror Butler said he would have no difficulty disregarding what he had previously heard about the case in reaching a verdict in the Defendant's case.

Juror Elizabeth Davidson said that she had read about the Defendant's case, which she

heard involved "somebody embezzling money or something through Jacky Jones [car dealership], and then fleeing to Arizona or somewhere." Juror Davidson associated the Defendant's name with the embezzling activity she had heard about. She confirmed, however, that she could reach an impartial verdict, saying, "I've got an open mind on it. I don't really have a clue what happened."

The Defendant challenged each of these six jurors for cause, arguing that each juror's pre-trial exposure to the Defendant's other alleged criminal acts prevented him or her from reaching an impartial verdict. The trial court refused to remove the jurors for cause, finding that they had satisfactorily testified that they would reach a decision based only upon the evidence introduced at trial. The Defendant exercised three of his peremptory strikes to strike Jurors West, McLemore, and Butler. Juror Fadeley served as an alternate juror, but Jurors Davidson and Millsaps did not serve on the jury.

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (citing *Tooms v. State*, 270 S.W.2d 649, 650 (Tenn. 1954)). In Tennessee, challenges to juror qualifications generally fall into two categories: propter defectum, "on account of defect"; or propter affectum "for or on account of some affection or prejudice." *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003); *Akins*, 867 S.W.2d at 355. General disqualifications such as alienage, family relationship, or statutory mandate are classified as propter defectum and must be challenged before the return of a jury verdict. *Akins*, 867 S.W.2d at 355. An objection based upon bias, prejudice, or partiality is classified as propter affectum and may be made after the jury verdict is returned. *Id*. "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced." *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993) (citing *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980). The defendant bears the burden of proving a prima facie case of bias or partiality. *Id*. (citing *Taylor*, 669 S.W.2d at 700).

Relative to challenges of prospective jurors for cause, Rule 24(b), Tennessee Rules of Criminal Procedure, provides in part as follows:

Any party may challenge a prospective juror for cause if:

    (1) There exists any ground for challenge for cause provided by law; or
    (2) The prospective juror's exposure to potentially prejudicial information makes him unacceptable as a juror. Both the degree of

exposure and the prospective juror's testimony as to his state of mind shall be considered in determining acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and if he remembers information that will be developed in the course of the trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall depend on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial.

Although jurors may be excluded for cause if they have formed an opinion which will prevent impartiality, "[j]urors need not be totally ignorant of the facts of the case on which they sit [and even] the formation of an opinion on the merits will not disqualify a juror if [the juror] can lay aside [his or her] opinion and render a verdict based on the evidence presented." *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). The United States Supreme Court has made the following observation:

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

*Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961). Thus, so long as a juror can set aside any previously-formed opinions and render a verdict based upon the evidence presented in court, the juror may properly participate in the case. *Id.* Irrespective of whether the trial judge should have excluded the challenged jurors for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. *Howell*, 868 S.W.2d at 248; *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989). The failure to correctly excuse a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him. *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988); *State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990).

In the case under submission, the Defendant did, in fact, exhaust all of his peremptory

challenges. There is no evidence, however, that the jury who heard the case was not fair and impartial. This alone prevents him the relief he seeks. As noted above, none of the challenged prospective jurors actually sat on the Defendant's jury. Even were their pre-trial knowledge of the Defendant's rumored criminal conduct so prejudicial as to require excusal under Rule 24(b)(2), because the prospective jurors did not ultimately serve on the jury, no actual bias or prejudice resulted from the trial court's failure to excuse them for cause.

Further, all of the jurors except one expressed statements of impartiality. Jurors Fadeley, West, McLemore, Butler, and Davidson unequivocally stated that he or she could render an impartial verdict. Juror Millsaps, in contrast, repeatedly said she "did not really know" whether she could remain neutral. Even after the trial court extensively questioned the juror as to her ability to render an impartial verdict, Juror Millsaps responded only that she "probably [would] not" hesitate to return a not guilty verdict were the evidence to fall short of proving the Defendant's guilt. This statement does not seem to be one of impartiality, and Juror Millsaps should have been excused. As previously stated, however, Juror Millsaps did not sit on the jury. We, therefore, conclude that any error is harmless because the Defendant has not proven that the jury who actually heard the case was not fair and impartial. *See Howell*, 868 S.W.2d at 248; *Thompson*, 768 S.W.2d at 246. He is not entitled to relief on this issue.

### F. State's Re-call of Witness A.J. Smith to Establish Venue

The Defendant contends the trial court abused its discretion by allowing the State to re-call witness A.J. Smith to testify that the events about which he had earlier testified occurred in Monroe County. The Defendant argues that allowing the State to re-call Smith was improper because it allowed Smith to add to his original testimony rather than merely clarify a misstatement in his original testimony. The Defendant contends that re-calling Smith after the trial court dismissed Counts One through Four for failure to establish venue gave the State the opportunity to inform the witness, whose property lay in three counties, of its failure to prove venue for Counts One through Four.

The State responds that, even if the trial court abused its discretion in allowing the State to re-call witness Smith, the error was harmless because Smith was re-called "for the limited purpose of clarifying venue."

The trial court has discretion in determining whether it will allow a party to recall a witness, and it does not constitute error absent an abuse of discretion. *State v. Reid*, 213 S.W.3d 792, 845 (Tenn. 2006); *Lillard v. State*, 528 S.W.2d 207, 212 (Tenn. Crim. App. 1975). We note that this court has upheld a trial court's decision to allow the State to reopen its case specifically to present proof of venue. *See Clariday v. State*, 552 S.W.2d 759, 770-

71 (Tenn. Crim. App. 1977); *State v. Robert Glen Grissom*, No. 02C01-9204-CC-00076, 1993 WL 64276, *4 (Tenn. Crim. App., at Jackson, Mar. 10, 1993), *no Tenn. R. App. P. 11 application filed*; *State v. H.B. Calhoun*, No. 278, 1990 WL 120114, *1 (Tenn. Crim. App., at Knoxville, Aug. 21, 1990), *perm. app. denied* (Tenn. Dec. 10, 1990).

When victim A.J. Smith testified at trial about the contemplated land sale that led to the charges in this case, he specified neither the county in which he initially met with the Defendant nor the county in which the Defendant gave him fraudulent checks. At the close of the State's proof, the trial court allowed the State to reopen its proof and re-call Smith to testify in order to "clarify location and venue." Smith explained that the Monroe County and Loudon County dividing line lies on his property. He testified that his house, where he and the Defendant initially met, was in Loudon County and that the farm building, where the Defendant gave him the fraudulent checks, was in Monroe County. He testified that his office and his house are approximately one mile apart.

The Defendant suggests that the State had the opportunity to "coach" Mr. Smith before he was recalled, instructing him to testify that the Defendant gave him the checks at issue while the two were standing in Monroe County. We find nothing in the record to support the Defendant's assertion that the State coached witness Smith, and we do not find the circumstances surrounding the State's request to recall witness Smith to be otherwise suspicious. Thus, we conclude that the trial court did not abuse its discretion when it allowed the State to recall Mr. Smith. The Defendant is not entitled to relief on this issue.

### G. Proof of Venue

The Defendant contends the evidence was insufficient to establish that the events alleged in Counts Five through Eight occurred in Monroe County. He argues that proof of venue was "tenuous at best" because it was based on Mr. Smith's testimony that his farm building was "just over" the Monroe County line and that he paid property taxes on the building to Monroe County. As such, the Defendant contends, the State failed to properly establish venue.

The State responds that witness Smith's testimony established by a preponderance of the evidence that his office building was in Monroe County and that, as such, the record supports the trial court's determination that venue was proper in Monroe County.

"Proof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence." *State v. Young*, 196 S.W.3d 85, 101 (Tenn. 2006) (quoting *State v. Hutcherson*, 790 S.W.2d 532, 535 (Tenn. 1990) and citing T.C.A. § 39-11-201(e)). "Venue is a question for the jury and

may be proven by circumstantial evidence." *Id*. at 101-02 (internal citations omitted). "Slight evidence" satisfies the State's burden if the evidence is uncontradicted. *State v. Bennett*, 549 S.W.2d 949, 951 (Tenn. 1977). In determining venue, the jury is entitled to draw reasonable inferences from the evidence. *Young*, 196 S.W.3d at 102.

As discussed above, on direct examination, Mr. Smith testified that the Defendant gave him fraudulently altered checks during business meetings conducted in a farm building on Mr. Smith's property. He did not specify the county in which the farm building was located. When the State re-called Mr. Smith at the close of its proof, Mr. Smith testified that his property was located in both Loudon and Monroe Counties, but that his farm building, for which he paid a property tax to Monroe County, lay just inside Monroe County.

Having concluded that the trial court properly allowed the State to recall witness Smith in order to establish venue, we consider Mr. Smith's testimony on recall in evaluating the strength of the evidence supporting venue. The record contains adequate proof to establish by a preponderance of the evidence that venue was properly established as Monroe County: Mr. Smith testified that the office building where he and the Defendant were meeting when the Defendant gave him the checks at issue was located in Monroe County. Although this testimony alone satisfied the State's burden of establishing venue, Mr. Smith's further testimony that he paid property taxes on the office building to Monroe County gave further evidentiary support to the transaction having occurred in Monroe County. We conclude that the evidence does not preponderate against the jury's finding that Counts Five through Eight took place in Monroe County. The Defendant is not entitled to relief on this issue.

**H. Jury Instructions**

The Defendant contends the trial court failed to provide the jury with a "correct and complete charge of the law" in the following ways: (I) instructing the jury that the "apparent value" of the checks at issue determined the value range of the Defendant's alleged commission of forgery and that, as such, the value range of the checks was "over $60,000" for sentencing purposes; (ii) failing to include an instruction on facilitation, attempt; or the unauthorized use or possession of a credit card; and (ii) instructing the jury that all witnesses were presumed to be truthful. We address each contention in turn.

A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "clear and distinct exposition of the law" satisfies a defendant's constitutional right to trial by jury. *State v.*

*Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987) (quoting *Strady v. State*, 45 Tenn. 300, 307 (1868))). In other words, the court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions of the propriety of jury instructions are mixed questions of law and fact, our standard of review here is de novo, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

Generally, "a defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superceded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court should "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). The Tennessee Supreme Court, relying on the words of the United States Supreme Court, has noted that:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id*. (quoting *Boyde v. California*, 494 U.S. 370, 380-81 (1990)). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998).

### 1. Apparent versus Actual Value

The Defendant contends that the trial court erroneously instructed the jury that the range of the Defendant's offenses for sentencing purposes would depend upon the "apparent value" of the checks passed in this case whereas, the Defendant argues, the actual value of the checks determines the value range of the Defendant's convictions.

The State, citing *State v. Odom*, responds that the "apparent" value of a forged object is the proper value upon which to determine the value range of a theft-related conviction and that, as such, the trial court correctly instructed the jury to consider the apparent value of the

38

checks in this case. *State v. Odom*, 64 S.W. 370, 374 (Tenn. 2001).

In *Odom*, the Tennessee Supreme Court held that, because the Legislature intended to punish both forgery and criminal simulation "according to the apparent value" of the writing forged of the object made or altered, "the references to the theft statute . . . require grading the crimes of forgery and criminal simulation according to the apparent value of the writing or object . . . ." *Id*.

In this case, the trial court informed the jury that if it found the Defendant guilty of forgery it would then be tasked with fixing "the range of value" of the forged item. Based on this range of value, the jury would then use the theft grading statute to determining the class level of the offense for sentencing purposes and sentence the Defendant. It instructed the jury that the "value of property in a forged count is the apparent value of the writing forged or the object made or altered." The trial court cautioned the jury that the State had the burden of proving the value of the forged object beyond a reasonable doubt. The trial court issued the same instruction on fixing the range of value for the offenses of criminal simulation.

Reviewing the record de novo with no presumption of correctness, we find no error in the trial court's jury instruction about the value to be considered in setting the value range of the Defendant's forgery and criminal simulation convictions. The trial court's instruction that the jury should consider the "apparent" value of the forged and altered items is squarely in line with *Odom*'s mandate. *See id*. As such, we conclude that the trial court's instruction was nothing short of a "clear and distinct exposition of the law" and that, as such, the trial court properly instructed the jury in this respect. *See Phipps*, 883 S.W.2d at 150. The Defendant is not entitled to relief on this issue.

### 2. Omission of Instruction on Facilitation, Attempt, and Fraudulent Use of a Credit Card

The Defendant contends the trial court erred when, based on its finding that "an actual passing" of the checks took place in this case, it declined to instruct the jury on the lesser included offenses of facilitation and attempt. The Defendant argues that, because Ms. Turpin suffered no pecuniary loss and the Defendant received no pecuniary gain, the proof at trial would have supported a conviction for attempted forgery or criminal simulation.

The Defendant also argues the trial court erred when, based on its finding that "the unauthorized use or possession of a credit card" was not charged in the indictment and did not appear on the list of lesser-included offenses of forgery, it declined to instruct the jury on said offense. He argues that the unauthorized use or possession of a credit card is a lesser

39

included offense of forgery and that, because the proof showed that "no property, credit, goods, or services [were] actually received or obtained," the proof supported an instruction on the unauthorized use or possession of a credit card. The Defendant does not, however, address whether the credit card law applies where, as here, a credit card *check* is used.

The State responds that the trial court properly refused to give instructions on facilitation and attempt because the evidence demonstrated that the checks in this case were actually passed. It responds that the trial court correctly refused to instruct the jury on the unauthorized use or possession of a credit card.

A trial judge has a mandatory duty to instruct the jury on all lesser included offenses of the offense charged that are supported by the evidence. *State v. Burns*, 6 S.W.3d 453, 467, 470 (Tenn. 1999). Both attempt and facilitation are lesser included offenses of the completed offenses of forgery and criminal simulation. *Id.* A person is criminally responsible for the facilitation of a felony if, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403 (2009). The circumstances under which it is error not to charge attempt and facilitation are narrow. *State v. Banks*, 271 S.W.3d 90, 127 (Tenn. 2008). With regard to attempt, which is an inchoate offense, where the evidence clearly establishes the completion of the crime, it is unnecessary for the trial court to charge the jury as to attempt. *Id*.

The State presented evidence that clearly established the completion of all four of the charged offenses. The Defendant committed two acts of forgery when he executed two checks without Ms. Turpin's authorization, and he committed two acts of criminal simulation when he altered the checks to appear to be from the account of "Mr. Jamie Turpin" rather than "Ms. Jamie Turpin." Because the evidence does not suggest that the crimes were attempted but not completed, the record does not support an instruction on attempt. *See Banks*, 271 S.W.3d at 127. The Defendant neither presented evidence nor elicited testimony on cross-examination suggesting the applicability of facilitation of the forgeries and criminal simulations. Because facilitation was not fairly raised by any proof submitted at trial, the trial court had no duty to instruct the jury with respect to it. *See Burns*, 6 S.W.3d at 470. As such, we conclude that the omission of attempt and facilitation instructions from the jury instructions in this case did not prevent the instructions from being a "correct and complete charge of the law." *See Teel*, 793 S.W.2d at 249.

The Defendant next contends that fraudulent use of a credit card is a lesser included offense of forgery and that, as such, the trial court should have instructed the jury on fraudulent use of a credit card. In *Burns*, the Tennessee Supreme Court adopted a test for determining whether a particular offense is a lesser included offense of another offense.

*State v. Burns*, 6 S.W.3d 453, 466-67 (Tenn. 1999). Where the offense is not attempt, facilitation, or solicitation, which are all lesser included offenses of the completed or principle offense, an offense is lesser included where:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or
(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
      (1) a different mental state indicating a lesser kind of culpability; and/or
      (2) a less serious harm or risk of harm to the same person, property or
          public interest

*Id*.

Tennessee Code Annotated section 39-14-114 (2006) provides that a person commits forgery where he or she "forges a writing with intent to defraud or harm another." "Forge" means to: "[a]lter, make, complete, execute or authenticate any writing so that it purports to: [b]e the act of another who did not authorize that act." T.C.A. § 39-14-114(b)(1)(A)(I) (2006). Forgery is a Class C felony if the amount involved is between $10,000 and $60,000, and forgery is a Class B felony if the amount involved is $60,000 or more. T.C.A. §§ 39-14-105, -114© (2006).

"A person commits the crime of illegal possession of a credit or debit card who, knowing the person does not have the consent of the owner or issuer, takes, exercises control over or otherwise uses such card or information from such card." T.C.A. § 39-14-118(a) (2006). Fraudulent use of a credit card is punishable as theft pursuant to Tennessee Code Annotated section 39-14-105 depending on the amount of property, credit, goods, or services obtained. T.C.A. § 39-14-118(c)(1). If no property, credit, goods, or services is actually received or obtained, fraudulent use of a credit card is a Class B misdemeanor for offenses committed prior to May 1, 2008, and a Class A misdemeanor for offenses committed on or after that date. T.C.A. § 39-14-118(c)(2).

Applying part (a) of the test announced in *Burns*, we first examine whether all of the statutory elements of the fraudulent use of a credit card are included within the statutory elements of forgery. Neither of the parties on appeal addresses whether the offense of the fraudulent use of a credit card requires that the accused have used a credit *card* rather than a check from a credit account. The language of Tennessee Code Annotated section 39-14-118(a) criminalizes the fraudulent use of a "credit or debit card." "When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's

41

application." *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). In such a case, our obligation is to enforce the written language without reference to the broader statutory intent, the history of the legislation, or other sources. *Abels ex rel. Hunt v. Genie Indus. Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006). In our view, the language of Tennessee Code Annotated section 39-14-118(a) is "clear and unambiguous." Therefore, we apply the plain meaning of "credit or debit card" in determining the statutory elements of the fraudulent use of a credit card. *See Eastman Chem Co.*, 151 S.W.3d at 507. We do not think it accidental that the Legislature used the language "credit or debit cards" rather than the language "any instrument relating to a credit or debit account." Though a credit card and a credit card check are both drawn from a credit account, they are distinct instruments with distinct methods of use and access. Thus, interpreting the plain meaning of section 39-14-118(a), we conclude that the offense of fraudulent use of a credit card includes the statutory element of the use of a *card*. The use of a check or other instrument relating to a credit or debit account will not suffice to satisfy this statutory element.

Given our holding that the use of an actual credit card is a statutory element of the fraudulent use of a credit card, it is clear that the offense of forgery, which requires only that a person forge a writing with the intent to defraud another, does not include all the statutory elements of the fraudulent use of a credit card. *See* T.C.A. § 39-14-114. Thus, the fraudulent use of a credit card fails to meet the definition in part (a) of the *Burns* test for lesser included offenses. *See Burns*, 6 S.W.3d at 466. Further, we perceive no way in which the use of a credit card, which is the statutory element absent from the offense definition of forgery, establishes either "a differing mental state" or "a less serious harm or risk of harm to the same person, property or public interest" for the offense of the fraudulent use of a credit card. *See id*. Having examined the *Burns* factors, we conclude that the fraudulent use of a credit card is not a lesser-included offense of forgery. Thus, the trial court did not err when it declined to charge the jury on the elements of the fraudulent use of a credit card. The Defendant is not entitled to relief on this issue.

### 3. Instruction on Presumed Truthfulness of All Testifying Witnesses

The Defendant argues that the trial court's instruction that all witnesses are presumed to be truthful undermines his constitutional right to not testify against himself and his right against arguments that his decision to not testify should be taken as an inference of guilt.

The State responds that this Court has held that an instruction that every witness is presumed truthful does not violate the United States or Tennessee Constitution. *See State v. Torrance Johnson*, No. 02C01-9610-CR-0030, 1998 WL 32687, at *4 (Tenn. Crim. App., at Jackson, Jan. 30, 1998) (citing *Lundy v. State*, 752 S.W.2d 98, 104 (Tenn. Crim. App. 1987)), *perm. app. denied* (Tenn. Nov. 2, 1998); and *State v. Glebock*, 616 S.W.2d 897, 906

(Tenn. Crim. App. 1981)).

A criminal defendant's rights against involuntary self-incrimination includes the right not to testify against oneself and the right against inferences of guilt being drawn therefrom. The Defendant in this case argues that the instruction that every witness was presumed truthful "infringed on his constitutional right" against involuntary self-incrimination and was an "improper comment on the evidence by the trial court." However, where a jury is charged "fully and explicitly on the presumption of innocence and the State's duty to prove guilt beyond a reasonable doubt," an instruction that all testifying witnesses are presumed truthful is "constitutionally sound." *Lundy v. State*, 752 S.W.2d 98, 103 (Tenn. Crim. App. 1987). *See State v. Glebock*, 616 S.W.2d 897, 906 (Tenn. Crim. App. 1981) (citing *Cupp v. Naughton*, 414 U.S. 141 (1973)).

In this case, the trial court instructed the jury on the issue of reasonable doubt on each charged offense and all applicable lesser included offenses. The trial court also instructed the jury on the burden of proof imposed upon the State to rebut the Defendant's presumption of innocence and the obligation of the State to prove him guilty beyond a reasonable doubt. We conclude that the trial court "fully and explicitly" charged the jury on the Defendant's presumption of innocence and the State's burden of proving the charges beyond a reasonable doubt. As such, the trial court's instruction that all testifying witnesses were presumed truthful did not violate the Defendant's right against involuntary self-incrimination and was not an improper commentary upon the evidence. *See Lundy*, 752 S.W.2d at 103. The Defendant is not entitled to relief on this issue.

## I. Sufficiency of the Evidence

The Defendant contends the evidence is not sufficient to support his convictions for forgery and criminal simulation. We will address his specific contentions, and the State's responses, below.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute

its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Evidence Supporting the Defendant's Convictions for Forgery

The Defendant contends the evidence was insufficient to support his convictions for forgery because the evidence showed neither that he acted "without authorization" nor that he acted "with the intent to defraud" Jamie Turpin.

To support the Defendant's forgery conviction in this case, the State had to prove beyond a reasonable doubt that he forged a writing with the intent to defraud or harm another. *See* T.C.A. § 39-14-114(a) (2006). A writing is forged when it is completed or executed so that it purports to be the act of another who did not authorize the act. T.C.A. § 39-14-114(b)(1)(A)(I).

### a. "Without Authorization" Element

44

The Defendant argues that, pursuant to the doctrine of "cancellation," witness Turpin's testimony that she authorized the Defendant to use her credit card checks cancelled out her testimony that she did not authorize the Defendant to use her checks. He argues that, because these conflicting statements were the only evidence offered to prove he acted without authorization, the proof was insufficient to establish this element, and his conviction should be reversed.

The State responds that the rule of cancellation did not require the jury to discount Ms. Turpin's testimony because other portions of Ms. Turpin's testimony explained the apparent contradiction. It argues that Ms. Turpin's testimony that she was scared of the Defendant and that he asked to use her checks and told her not to ask any questions explains her apparently contradictory testimony that she allowed the Defendant to use her checks for groceries but "did not authorize" the Defendant to use her checks for anything other than groceries.

Contradictory statements made by a witness as to the same fact, in some circumstances, can cancel each other out. *State v. Caldwell*, 977 S.W.2d 110, 118 (Tenn. Crim. App. 1997). However, this rule applies only when inconsistency in a witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence. *Id*.

In the present case, Ms. Turpin testified that she received the checks in this case from her credit card company and that the Defendant, of whom she was frightened, told her he needed the checks. Ms. Turpin gave the Defendant the checks, expecting that the Defendant would use the checks for living expenses, such as groceries. At trial, Ms. Turpin reviewed the checks written to Mr. Smith and testified she did not authorize the Defendant to write the checks to Mr. Smith.

Initially, we note the problem with the voluntariness of the consent Ms. Turpin gave the Defendant. The record is clear that the Defendant employed a variety of tactics to manipulate Ms. Turpin into giving him control over her credit and checking accounts. Thus, Ms. Turpin's bare act of allowing the Defendant to use her checks to pay miscellaneous living expenses was, in a sense, not wholly informed and voluntary. In this sense alone, Ms. Turpin's testimony belies the Defendant's insistence that he acted with her authorization in writing the checks to Mr. Smith.

Further, Ms. Turpin did not contradict herself when she testified at trial. Even assuming that her authorization to use the checks for groceries was valid for purposes of the forgery statute, this authorization had reasonable limits. The scope of the authorization Mr. Turpin gave the Defendant to use her checks did not include writing checks in the amounts

of $250,000 and $27,000,000. Therefore, in our view, rather than being contradictory, Ms. Turpin's testimony describes the scope of the consent she gave the Defendant to use her credit card checks. She had, in essence, fearfully assented to the Defendant's demand to use her checks but had never contemplated that he would write checks on her account in excess of $25,000,000, thus making his use of the checks "without authorization." We conclude that Ms. Turpin's testimony was not contradictory. However, insofar as the testimony was facially contradictory, we conclude that Ms. Turpin's testimony, as a whole, explains these apparent contradictions. As such, the evidence supports the jury's finding beyond a reasonable doubt that the Defendant acted without Ms. Turpin's authorization. *See Caldwell*, 977 S.W.2d at 118. The Defendant is not entitled to relief on this issue.

### b. "Intent to Defraud" Element

The Defendant argues the State failed to prove beyond a reasonable doubt that the Defendant acted with the intent to defraud Jamie Turpin. He contends that the "ridiculousness of the amounts assigned to the credit card checks belies any attempt to defraud Ms. Turpin," emphasizing that Mr. Smith never cashed the checks given to him by the Defendant and that Ms. Turpin was never required to pay for the checks written on her account.

The State responds that, by signing Jamie Turpin's name to the checks at issue, the Defendant had the requisite intent to defraud another.

The record is clear that the Defendant possessed the intent to defraud both Ms. Turpin and Mr. Smith. The evidence viewed in the light most favorable to the State first shows that the Defendant cultivated a romantic relationship with Ms. Turpin over the course of several months, during which time he convinced Ms. Turpin that both she and her family were in danger of being attacked by the mob. The Defendant used both his romantic relationship and the fear he had instilled in Ms. Turpin to induce Ms. Turpin not only to give him access to her credit and checking accounts, but also to allow him to create new accounts in her name. By the time Ms. Turpin received the credit card checks in this case from her Canadian bank, the Defendant had already woven an intricate web of lies that led Ms. Turpin to believe that the Defendant was only borrowing money from her long enough to extricate not only himself but also Ms. Turpin and her family from the danger they faced from his mob ties. Unbeknownst to Ms. Turpin, the Defendant had no way of repaying Ms. Turpin. Operating under his guise, the Defendant was easily able to induce Ms. Turpin to give him access to her credit card checks. With the same intent to defraud Ms. Turpin that he possessed during their entire relationship, the Defendant wrote the checks at issue in this case, intending that any charges or fees that resulted from these checks would be charged to Ms. Turpin.

Second, the evidence shows that the Defendant wrote the checks at issue in this case, knowing that the accounts from which the checks were written did not contain sufficient funds to cover the checks. The amount in which the checks were written unquestionably raises the question of whether the Defendant could reasonably have expected that the checks would pass, and Mr. Smith would give him title to the farm. However, in assessing the mental state possessed by a defendant when taking a particular course of action, we are not tasked with determining whether the mental state was objectively reasonable. Rather, we are tasked with determining whether the defendant actually possessed the relevant mental state. In this case, we conclude that the Defendant gave the checks to Mr. Smith with the intent that Mr. Smith would believe the checks were legitimate and, in turn, would give him the benefit of ownership of the farm. Further, though the Defendant argues his intent to defraud is not obvious from the record because Mr. Smith never deposited the checks, the record shows that, after the Defendant gave Mr. Smith the checks, the Defendant received the benefit of living on Mr. Smith's property for several weeks. Thus, we conclude that the record also supports the conclusion that the Defendant wrote the checks in this case with the additional intent of defrauding Mr. Smith into allowing him to live on the farm, while he knew the checks he wrote Mr. Smith would never be paid.

In summary, the record amply supports the statutory element of "intent to defraud" in this case. As such, we conclude that the evidence was sufficient to support a finding beyond a reasonable doubt by the jury that the Defendant was guilty of two counts of forgery. *Goodwin*, 143 S.W.3d 771, 775. He is not entitled to relief on this issue.

**2. Evidence Supporting the Defendant's Convictions for Criminal Simulation**

The Defendant attacks the sufficiency of the counts of the indictment charging him with criminal simulation, the proof supporting the elements of criminal simulation, and the applicability of the offense of criminal simulation given that, in his view, his conduct is proscribed elsewhere in Tennessee's criminal code.

The Tennessee Code defines the offense of criminal simulation as follows:

(1) A person commits the offense of criminal simulation who, with intent to defraud or harm another:

   (A) Makes or alters an object, in whole or in part, so that it appears to have value because of age, antiquity, rarity, source or authorship that it does not have;
   (B) Possesses an object so made or altered, with intent to sell, pass or otherwise utter it; or

© Authenticates or certifies an object so made or altered as genuine or as different from what it is.

(2) A person commits the offense of criminal simulation who, with knowledge of its character, possesses:

(A) Any machinery, plates or other contrivances designed to produce instruments reporting to be credit or debit cards of an issuer who had not consented to the preparation of the cards; or

(B) Any instrument, apparatus or contrivance designed, adapted or used for commission of any theft of property or services by fraudulent means.

T.C.A. § 39-14-115(a) (2006).

### a. Sufficiency of the Indictment

The Defendant contends that the counts of the Indictment charging him with criminal simulation did not allege the essential elements of criminal simulation and, thus, that the Indictment did not comply with *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991).

An indictment must state the facts of the offense in ordinary and concise language "in such a manner as to enable a person of common understanding to know what is intended." *See* T.C.A. § 40-13-202. An accused is constitutionally guaranteed the right to be informed of the nature and cause of the accusation. *State v. Lindsey*, 208 S.W.3d 432, 437-38 (Tenn. Crim. App. 2006) (citing U.S. Const. amend. 6, 14; Tenn. Const. art. I, § 9; *see Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000)). An indictment meets constitutional requirements if it provides sufficient information to: (1) enable the accused to know the accusation to which an answer is required, (2) furnish the court an adequate basis for the entry of a proper judgment; and (3) protect the accused from double jeopardy. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." *Id.* (citing T.C.A. § 40-13-202). An indictment need not conform to strict pleading requirements. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).

Count Six of the indictment in this case charged:

On or about the 19th day of February, 2008, in Monroe County, Tennessee, and

before the finding of this indictment, [the Defendant] did unlawfully and intentionally, or knowingly, with intent to defraud or harm another, make or alter an object in whole or in part, to wit: a check numbered "1000," so that the object did appear to have a value of more than [$60,000] in violation of T.C.A. 39-14-115, all of which is against the peace and dignity of the State of Tennessee.

Count Eight of the Indictment charged:

On or about the 19th day of February, 2008, in Monroe County, Tennessee, and before the finding of this indictment, [the Defendant] did unlawfully and intentionally, or knowingly, with intent to defraud or harm another, make or alter an object in whole or in part, to wit: a check numbered "1001," so that the object did appear to have a value of more than [$60,000] in violation of T.C.A. 39-14-115, all of which is against the peace and dignity of the State of Tennessee.

The Defendant argues that, because Counts Six and Eight did not allege that the checks were altered to appear to have value "because of age, antiquity, rarity, source or authorship that [they] did not have," the indictment did not provide the Defendant with sufficient notice of the charge or the trial court with adequate ground upon which to enter a judgment. We cannot agree that the indictment in this case was deficient.

We conclude the indictment in this case gave the Defendant sufficient notice of the charges the State intended to pursue. First, Counts Six and Eight set out the date on which the Defendant was alleged to have written the checks in issue, the amount in which he was alleged to have written the checks, and the serial number appearing on each of the checks he was alleged to have written. Thus, Counts Six and Eight stated the facts constituting the offense in "ordinary and concise language." *See Lindsey*, 208 S.W.2d at 438. Further, the counts cited the specific code section codifying the offense of criminal simulation. This reference, coupled with the counts' allegation that the Defendant, with the intent to defraud, "ma[d]e or alter[ed] an object in whole or in part" gave the Defendant notice that the State planned to prosecute him under subsection (a)(1)(A) of the section describing criminal simulation. The omission of the remaining language of subsection (a)(1)(A) (that the appearance of value was due to "age, antiquity, rarity, source or authorship that [the object] did not have ") from Counts Six and Eight did not prevent the counts from furnishing the Defendant with sufficient notice of the offense charged and the trial court with adequate ground upon which to enter its judgment. *See Hill*, 954 S.W.2d at 727. We conclude, therefore, that the indictment in this case adequately informed the Defendant of the nature and cause of the accusations against him. *See Lindsey*, 208 S.W.2d at 438.

## b. Element of "Alteration"

The Defendant next contends that, by changing the checks from "Ms. Jamie Turpin" to "Mr. Jamie Turpin," he did not "alter" the checks so that they appeared to have value "because of age, antiquity, rarity, source or authorship that [they] did not have." He also argues that a check written on a credit account in the amount of $27,000,000 could not reasonably "appear to have value."

The State responds that, by changing the "Ms." to "Mr.," the Defendant made it appear that he owned the checks and that he had the authority to write the checks, thereby giving the checks a value that they did not have. As such, it argues that the proof supports his convictions for criminal simulation.

In order to prove the Defendant's guilt of criminal simulation, the State had to prove beyond a reasonable doubt that the Defendant "[made] or alter[ed] an object, in whole or in part, so that it appear[ed] to have value because of age, antiquity, rarity, source or authorship that it did not have." T.C.A. § 39-14-115(a)(1)(A).

In this case, the Defendant adopted the alias of "Jamie Turpin" in his dealings with Mr. Smith. He told Mr. Smith that he possessed vast financial resources as a result of an inheritance he had recently received and from the sale of a home in Canada. Based on these representations of wealth, Mr. Smith agreed to sell the Defendant his farm. The Defendant procured credit card checks from the actual Jamie Turpin. These credit card checks were printed with the name, "Ms. Jamie Turpin," indicating that the payor of the check was Ms. Jamie Turpin. Using a pen, the Defendant changed the "s" to an "r," thereby making the checks appear to be written from the account of a "Mr." Jamie Turpin. The Defendant gave these checks to Mr. Smith in connection with the contemplated sale of Mr. Smith's farm to the Defendant.

By changing the "Ms." to "Mr." on the checks in this case, the Defendant "altered" the checks so that he appeared to be the payor, i.e. the "source" or "author" of the checks, whereas the true payor was Ms. Jamie Turpin. The Defendant by this time had expended considerable effort in convincing Mr. Smith that he had sufficient financial resources to buy Mr. Smith's farm. By altering the checks so that he appeared to be the payor, the Defendant made the checks appear to be backed by sufficient funds, the funds he had falsely represented to Mr. Smith that he had received by inheritance and through the sale of a home. Given the multiple misrepresentations made by the Defendant it becomes clear that, by altering the gender of the payor of the checks at issue in this case, the Defendant indeed altered the checks so that they "appear[ed] to have value because of age, antiquity, rarity, source or authorship that it did not have." *See* T.C.A. § 39-14-115(a)(1)(A).

50

As to the Defendant's argument that the credit checks could not "reasonably" have appeared to have their stated values, we note that an accused need not alter an object so that it "reasonably" appears to have a value due to its authorship or source. *See* T.C.A. § 39-14-115(a)(1)(A). The absurd or unreasonable amount of the value to which an accused alters an object does not prevent the conduct from being criminal under section 39-14-115(a)(1)(A). As such, we conclude that the evidence sufficiently supports the jury's finding that the Defendant "altered" the checks in this case within the meaning of the statute codifying criminal simulation. He is not entitled to relief on this issue.

### c. Codification of Alleged Conduct Elsewhere in Criminal Code

The Defendant offers *State v. Mark Walker* in support of his contention that the offense of criminal simulation is not applicable to the facts of this case because his alleged conduct is "expressly codified elsewhere in the criminal code." No. M2001-00341-CCA-R3-CD, 2001 WL 1558515, *8 (Tenn. Crim. App., at Nashville, July 16, 2002), *no Tenn. R. App. P. 11 application filed*.

In *Walker*, this Court explained that the intended purpose of the criminal simulation statute is "to prohibit theft by fraudulently passing counterfeit objects." As a consequence, we held that the Legislature did not intend criminal simulation to be applied where theft or financial gain does not appear to be the purpose of the use of the counterfeit object. We emphasized that, where such conduct that does not involve theft is otherwise codified in the criminal code, criminal simulation is especially inapplicable. Under the facts of *Walker*, we concluded that, because the defendant merely presented an officer with a fraudulent I.D. intending to defraud him into believing the I.D. was authentic, the defendant did not commit criminal simulation. This Court stated, "[T]he false identifications possessed by the defendant d[id] not have the type of value contemplated by the [criminal simulation] statute." In explaining our conclusion, we also emphasized that the defendant's conduct was expressly codified elsewhere in the criminal code as "criminal impersonation."

In the present case, the Defendant used the counterfeit checks in order to induce Mr. Smith into proceeding with the sale of Mr. Smith's farm as contemplated. As part of their contemplated agreement, Mr. Smith agreed to allow the Defendant and Ms. Poe to live on a house located on the farm. Thus, the Defendant's use of the counterfeit checks was for the purpose of obtaining the financial gain, in the form of immediate use and possession of the house located on the farm and, eventually, ownership of the farm itself. We conclude that the counterfeit checks used by the Defendant had the "type of value contemplated by the [criminal simulation] statute," and the Defendant used the checks for financial gain. Thus, the criminal simulation statute applies to the Defendant's conduct in this case.

51

Further, the Defendant fails to cite to a specific portion of the criminal code that criminalizes the Defendant's conduct apart from the criminal simulation statute. Given the applicability of the criminal simulation statute to the facts of the case and the absence of any other provision criminalizing the Defendant's conduct, we conclude that the application of the criminal simulation statute to the Defendant's conduct in this case is in keeping with the Legislature's intent. *See Walker*, 2001 WL 1558515, *8. The Defendant is not entitled to relief on this issue.

## J. State's Compliance with Notice Provisions of Tennessee Rule of Criminal Procedure 16

The Defendant contends the trial court erred when it denied his motion for new trial based on the State's failure to comply with Tennessee Rule of Criminal Procedure 16 by withholding the Defendant's letters, which the Monroe County Sheriff's Department intercepted while the Defendant was jailed in Monroe County. He argues that before trial the State either knew or, through the exercise of reasonable diligence, should have known that the Sheriff's Department was intercepting his mail. He contends that the State's failure to produce these letters, several of which were written to attorneys, violated Rule 16. He argues that, had he known of the letters before trial, he could have presented them as evidence that he attempted to obtain counsel and, thus, was not responsible for the delay of his trial past the 180-day Interstate Compact period. Thus, he argues, the State's failure to disclose these letters' existence caused him prejudice, and the trial court erred in denying his motion for new trial based on the State's failure to comply with Rule 16.

The State responds that it did not violate Rule 16 because none of the seized letters were addressed to defense counsel and, as the letters remained sealed, only the Defendant knew of the letters' content. It also responds that the Defendant fails to demonstrate how possession of the letters at issue would have altered his defense strategy.

Tennessee Rule of Criminal Procedure Rule 16(a)(1)(F) describes the circumstances under which the State must disclose certain "documents and objects":

(F) Documents and Objects. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:

(I) the item is material to preparing the defense;
(ii) the government intends to use the item in its case-in-chief at trial; or

52

(iii) the item was obtained from or belongs to the defendant.

Tenn. R. Crim. P. 16(a). Rule 16(a)(1)(F) only applies to documents and tangible objects that are "within the possession, custody or control of the state." *See, e.g.*, *State v. Hutchison*, 898 S.W.2d 161, 167-68 (Tenn. 1994) (holding that where the State did not have certain documents in its control until the middle of the trial, introduction of the documents did not violate Rule 16); *also see State v. Elizabeth Gay Tindell*, No. E2008-02635-CCA-R3-CD, 2010 WL 2516875, *15 (Tenn. Crim. App., at Knoxville, June 22, 2010), *perm. app. denied* (Tenn. Nov. 17, 2010).

To enforce Rule 16, Rule 16(d)(2) provides that, if there has been noncompliance, the trial court may order the offending party to permit the discovery or inspection, grant a continuance, prohibit the introduction of the evidence not disclosed, or enter such other order as the court deems just under the circumstances. *See State v. Leon Goins*, No. W1999-01681-CCA-R3-CD, 1999 WL 1531111, at *2 (Tenn. Crim. App., at Jackson, Dec. 27, 1999), *perm. app. denied* (Tenn. July 17, 2000). Whether a defendant has been prejudiced by the State's failure to disclose information is a significant factor in determining an appropriate remedy. *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). The Defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Brown*, 836 S.W.2d 557, 560 (Tenn. 1993). The determination of the appropriate remedy is left to the sound discretion of the trial judge, which is exercised upon examination of the circumstances presented in that particular case. *State v. Underwood*, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984) (citing *McBee v. State*, 372 S.W.2d 173 (Tenn. 1963)). "Thus, it is clear that the court has wide discretion to fashion a remedy that is appropriate for the circumstances of each case and the sanction must fit the circumstances of that case." *Id*. (citations omitted); *see State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984).

In this case, Tennessee officials took custody of the Defendant on November 13, 2008. The Defendant remained in the custody of the Monroe County Sheriff's Department while he awaited trial. His trial commenced on April 14, 2009, and he was convicted of the charges in this case. At the Defendant's motion for new trial hearing, proof submitted by the parties established that, while the Defendant awaited trial in the Monroe County Sheriff's Department, the Sheriff's Department intercepted several letters the Defendant attempted to send from jail. These letters included: one letter to Monroe County Sheriff's detective Pat Henry; three letters to the FBI; two letters to the ATF; one letter to the warden of the Arizona State Prison; one letter to an attorney in Arizona, Steven J.A. August; and one letter to an attorney in Athens, Tennessee, Randy Rogers. The letter to the Arizona attorney was dated January 27, 2009, and the letter to the Tennessee attorney was dated February 4, 2009. The trial court refused to allow the parties to open and inspect the letters, and it denied the

Defendant's motion for new trial.

The Defendant's letters can be characterized as "document or object" "obtained from or belong[ing] to the defendant," whose disclosure Tennessee Rule of Criminal Procedure 16 (a)(1)(B) describes. Upon the State's failure to comply with Rule 16, in order for the trial court to determine an appropriate remedy, the Defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *Brown*, 836 S.W.2d at 560. From our review of the record, we discern no manner in which the Defendant was prejudiced by not having the letters. As we discussed above in our analysis of the State's compliance with the Interstate Compact, the interception of the Defendant's letters does not alter our conclusion that the Defendant was lawfully tried within the time prescribed by the Compact. Thus, in this respect, even had he possessed these letters before trial, the letters would not have aided him in preparing a defense based on the State's failure to try him within the Compact period. The Defendant fails to cite to any other way in which discovery of the letters would have altered or aided the preparation of his defense in this case. As such, we conclude that the Defendant has precluded our review of this issue.

### K. Sentencing

The Defendant objects to the length of his sentence, contending that: (1) the trial court erred when it sentenced him as a Range II, Multiple Offender; and (2) his sentence violates the due process and excessive punishment clauses of the Tennessee and United States Constitutions.

When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court properly sentenced the defendant. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). As the Sentencing Commission Comments to this section note, the burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. If the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result was preferred. T.C.A. § 40-35-103 (2006), *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In

the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2009); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The Criminal Sentencing Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2) and (d) (2006); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In order to ensure "fair and consistent sentencing," the trial court must "place on the record" what, if any, enhancement and mitigating factors it considered as well as its "reasons for the sentence." T.C.A. § 40-35-210(e). Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors it found to apply to the defendant. T.C.A. § 40-35-401(b)(2) (2003). The 2005 amendments deleted as grounds for appeal, however, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8-9. In summary, although this Court cannot review a trial court's weighing of enhancement factors, we can review the trial court's application of those enhancement factors. T.C.A. § 40-35-401(d) (2006); *see Carter*, 254 S.W.3d at 343.

### 1. Multiple Offender Status

The Defendant contends the trial court erred in the following three respects when it determined that he had four previous Class C felony convictions from the state of Michigan and, thus, was a Multiple Offender. He asserts: (1) the State failed to list two convictions used to determine his status as a Multiple Offender in its notice of intent to seek enhanced punishment; (2) the trial court improperly determined that his two false pretenses convictions from Michigan were Class C felonies in Tennessee; (3) the trial court based its determination that the Defendant had two Class C felony criminal simulation convictions from Michigan upon unreliable hearsay.

**a. Notice of False Pretenses Convictions**

Earlier in this opinion, we determined that the State's notice of its intent to seek enhanced punishment was timely filed and, thus, that the trial court did not err when it denied the Defendant's motion to strike this notice. Under the sentencing portion of his brief, the Defendant again attacks the State's notice of its intent to seek enhanced punishment, arguing that, because the notice did not list two false pretenses convictions that the trial court used to determine his offender status, he had insufficient notice and the trial court erred when it found that the Defendant was a Multiple Offender based on these false pretenses convictions.

The State responds that its notice listed, among others, two convictions of "larceny by check" and, thereby, substantially complied with the requirements of Tennessee Code Annotated section 40-35-202(a) because it was not misleading, and it listed the offenses, where they occurred, and their general time frame. Further, the State contends, even were the notice insufficient, the Defendant's previous convictions for criminal simulation sufficiently support his classification as a Multiple Offender.

As discussed in our analysis dealing with the Defendant's objection to the timeliness of the State's filing of its notice of intent to seek enhanced punishment, Tennessee law requires the State to provide written notice to a defendant that the State intends to seek enhanced punishment if the defendant is convicted. T.C.A. § 40-35-202(a). The notice provision requires, at a minimum, that: (1) the State file written notice; (2) that the notice clearly express the State's intention to seek sentencing outside of the standard offender range; and (3) that the notice set forth the nature of the prior felony conviction, the dates of conviction, and the identity of the court of the conviction. *State v. Livingston*, 197 S.W.3d 710, 713 (Tenn. 2006). When a detail of the required information is omitted or incorrect, the inquiry should be whether the notice was "materially misleading." *Adams*, 788 S.W.2d at 559. The supreme court specifically held that "when the State has substantially complied [with the notice requirement], an accused has a duty to inquire about an ambiguous or incomplete notice and must show prejudice to obtain relief." *Id*. In other words, the notice statute requires "fair" rather than "perfect" notice. *Taylor*, 63 S.W.3d at 413.

In this case, the State filed its "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions" more than ten days before the Defendant's trial. The notice listed the following convictions:

| | | |
|---|---|---|
| 4-22-1994 | Carrying concealed weapon | 14th Circ/Muskegon Co., MI |
| 5-22-1996 | Larceny by check  x 2 | 14th Circ/Muskegon Co., MI |
| 3-10-2003 | Larceny by conversion > $1,000 | same |

| 4-20-2006 | Larceny by conversion > $1,000 | same |
| 10-31-1995 | Larceny > $1,000 | same |
| 6-26-2006 | Larceny by conversion > $1,000 x 2 | same |

At the Defendant's sentencing hearing, a presentence report and copies of the Defendant's judgments of conviction from Michigan were entered as exhibits. The presentence report indicated that the Defendant had twice been convicted of false pretenses in Michigan, and a judgment of conviction from Michigan reflected that on May 8, 1996, the Defendant was convicted of two counts of false pretenses under $100 in the 14th Judicial Circuit Court of Michigan in Muskegon County. Based on this evidence, the trial court determined that the Defendant had two false pretenses convictions from 1996 in Michigan. As we will discuss in greater detail below, the trial court determined that, because the judgment forms reflected the Defendant was ordered to pay $12,200 in restitution in connection with these convictions, the convictions were the equivalent of Class C felony theft convictions in Tennessee. Based on these two Class C felony convictions, the trial court declared the Defendant a Multiple Offender.

In Michigan, a person commits "false pretenses" where he or she "with the intent to defraud or cheat makes or uses a false pretense . . . [to obtain] a person's signature on a forged written instrument." Michigan Compiled Laws Service § 750.218(1)(b) (2009). The use of a check would qualify as a "forged written instrument" under this statute. M.C.L.S. § 750.218(1)(b). A person commits "check no account" where he or she, "with the intent to defraud," makes or draws "any check . . . for the payment of money, to apply on an account or otherwise, upon any bank or other depository, if at the time . . . he or she does not have an account in or credit with the bank . . . for the payment of the check . . . ." M.C.L.S. § 750.131(a) (2009).

Our review of the Defendant's judgments of conviction from Michigan reveals that he has three convictions from 1996: two May 8 convictions for "false pretenses 0/$100.00" and one May 22 conviction for "check no account." For the year 1996, the State's notice of its intent to use the Defendant's past criminal convictions listed only "larceny by check x 2," and it assigned the date of May 22, 1996, to these convictions. Obviously, this description of the Defendant's 1996 convictions constitutes a defect in the State's notice. Despite listing the wrong offense name for the convictions, the notice listed the correct year, month, and court of conviction. Also, we note the notice clearly sets out the State's intent to seek a sentence outside the standard sentencing range. *See Livingston*, 197 S.W.3d at 713. Further, "larceny by check" could reasonably be understood to refer to either the crime of false pretenses, which can be committed by using a check under false pretenses with the intent to defraud, or the crime of "check no account," which can be committed by writing a bad check. M.C.L.S §§ 750.218(1)(b), 750.131(a). We conclude that the similarity between the offenses

named in the notice and those named on the Michigan judgment forms supports the trial court's finding that, in listing the larceny by check convictions from 1996 on its notice, the State "set forth the *nature*" of the prior felony convictions it intended to use in its prosecution. *See Livingston*, 197 S.W.3d at 713 (emphasis added). In light of this conclusion and in light of the correct recitation of the year, month, and court of conviction, we conclude that the notice was not "materially misleading." *See id*; *Adams*, 788 S.W.2d at 559. We note that the objective of the State's notice of its intent to use a defendant's criminal record at trial or sentencing is not to inform the defendant of the existence of his prior convictions. Rather, the objective is to give him notice of the nature and magnitude of the enhanced punishment the State will seek in the defendant's case and the general legal basis upon which it will do so. We believe this objective was satisfied in this case. The Defendant is not entitled to relief on this issue.

### b. Classification of Michigan False Pretenses Convictions as Class C Felonies

The Defendant argues the trial court erred when it found that his false pretenses convictions in Michigan were the equivalent of Class C felonies in Tennessee. The certified copies of the judgments of sentence from Michigan show that the Defendant was convicted of two counts of false pretenses "0/$100.00 SUPP 2nd" in 1996 for which he was ordered to pay restitution in the amount of $12,200. The Defendant contends the trial court erred when it determined that the restitution award of $12,200 represented the value of the checks underlying his false pretenses convictions and, on that basis, classified each conviction as a forgery involving an amount greater than $10,000 but less than $60,000, a Class C felony.

The State responds that, even if the trial court erred when it classified the Defendant's false pretenses convictions as Class C felony forgeries in Tennessee, the Defendant's Michigan convictions for criminal simulation sufficiently support his classification as a Multiple Offender.

To be classified as a Range II Multiple Offender, a defendant must have "a minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes." T.C.A. § 40-35-106(a)(1) (2006). When applying out-of-state convictions to determine the applicable sentencing range, the code further provides:

Prior convictions include convictions under the laws of any other state, government or country which, if committed in this state, would have constituted an offense cognizable by the laws of this state. In the event that a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to

58

determine what classification the offense is given.

T.C.A. § 40-35-106(b)(5). Because the Defendant in this case was convicted of four Class B felony offenses, the State had the burden of proving that the Defendant had between two and four felony convictions from either Class A, Class B, Class C, or Class D. *See* T.C.A. § 40-35-106(a)(1).

The Defendant's two false pretenses convictions appear on a single judgment form. Each conviction is listed as "false pretenses 0/$100 SUPP 2nd," and the Defendant received a sentence of five to fifteen years for each count. The form also orders the Defendant to pay $12,200 in restitution.

As mentioned above, in Michigan, a person commits "false pretenses" where he or she "with the intent to defraud or cheat makes or uses a false pretense . . . [to obtain] a person's signature on a forged written instrument." M.C.L.A. § 750.218(1)(b). Where the amount involved is between $200 and $1000, false pretenses is punishable by one year of imprisonment and fine of $2,000 or three times the value of the property stolen. M.C.L.A. § 750.218(3)(a). Where the amount involved is between $1,000 and $20,000, false pretenses is punishable by five years imprisonment and a fine of $10,000 or three times the value of the property stolen. M.C.L.A. § 750.218(4)(a). If the amount involved is above $20,000, false pretenses is punishable by ten years imprisonment and a fine of either $15,000 or three times the value of the property stolen. M.C.L.A. § 750.218(5)(a). In Michigan, an accused previously convicted of a felony is subject to enhanced sentencing as a "second offender."

The Defendant appears to have been sentenced as a second offender for his false pretenses convictions, as each conviction is listed as "false pretenses SUPP 2nd." Further, because the Defendant received a sentence of five to fifteen years for each of his convictions, we infer that the amount involved in each conviction exceeded $1,000. *See* M.C.L.A. § 750.218(4)(a).

In Tennessee, the grading of theft is based on the value of the property stolen. T.C.A. § 39-14-105 (2003). Theft is:

(1) A Class A misdemeanor if the value of the property or services obtained is five hundred dollars ($500) or less;

(2) A Class E felony if the value of the property or services obtained is more than five hundred dollars ($500) but less than one thousand dollars ($1,000);

(3) A Class D felony if the value of the property or services obtained is one

59

thousand dollars ($1,000) or more but less than ten thousand dollars ($10,000);

(4) A Class C felony if the value of the property or services obtained is ten thousand dollars ($10,000) or more but less than sixty thousand dollars ($60,000); and

(5) A Class B felony if the value of the property or services obtained is sixty thousand dollars ($60,000) or more.

T.C.A. § 39-14-105(1)-(5) (2006).

Based on the evidence introduced at sentencing, the trial court found that the Defendant had two 1996 false pretenses convictions from Michigan and that these convictions were the equivalent of theft involving an amount greater than $10,000, which is a Class C felony in Tennessee. The trial court found that, based on these two Class C felony convictions, the Defendant was a Range II, Multiple Offender. The trial court noted that the Tennessee Code's classification of several of the Defendant's remaining convictions from Michigan was "not as clear."

The record does not support the trial court's conclusion that the Defendant's false pretenses convictions were the equivalent of Class C felony convictions in Tennessee. Although the false pretenses judgment form contains sufficient indicia that the amount involved in each offense was at least $1000, the form does not indicate that the amount involved in each offense was at least $10,000, as a Class C felony theft conviction in Tennessee requires. Even taking into account the restitution order of $12,200, this fine could represent an aggregate fine imposed for each count; for example, each count may have only involved an amount of $6100. In our view, the record does not establish beyond a reasonable doubt that the amount involved in the false pretenses convictions was $10,000 or more. *See* T.C.A. § 40-35-106(b)(5). Thus, we conclude that the trial court erred by finding that the Defendant's false pretenses convictions were each the equivalent of a Tennessee Class C felony theft conviction, which requires the amount involved to be at least $10,000. *See* T.C.A. § 39-14-105(4).

Nonetheless, because the record establishes beyond a reasonable doubt that the each commission of false pretenses involved at least $1000, we conclude that each false pretense conviction was the equivalent of a Class D felony theft conviction in Tennessee. *See* T.C.A. § 39-14-105(1)-(5). As such, we conclude that the record would nonetheless support the trial court's conclusion that the Defendant, based upon the Defendant's two false pretenses convictions, was a Range II, Multiple Offender. *See* T.C.A. § 40-35-106(a)(1). He is not entitled to relief on this issue.

### c. Evidence Supporting the Existence of Michigan Larceny by Conversion Convictions

The Defendant contends the trial court erred in finding that the Defendant had two Michigan convictions for larceny by conversion (the equivalent of criminal simulation in Tennessee) involving more than $1000 but less than $20,000 where only the "unreliable hearsay" of the presentencing officer's testimony supported these convictions and where no certified copies of these convictions from the state of Michigan were introduced. He argues that the trial court relied on theses convictions in determining him to be a Multiple Offender and that, as such, his status should be reduced to that of a Standard Offender.

The State responds that, because hearsay is admissible during sentencing, and the presentence officer's correspondence with Michigan officials made his reports reliable, the evidence supports the trial court's finding that the Defendant had two prior Michigan convictions for larceny by conversion in an amount greater than $1000 but less than $20,000.

First, we note that, contrary to the Defendant's assertion on appeal, the trial court did not rely on the Defendant's larceny by conversion convictions when it declared him a Range II, Multiple Offender. The trial court relied only on the Defendant's false pretenses convictions, noting that the Tennessee equivalency of the remainder of the Defendant's Michigan convictions was "less clear." As we explained above, the Defendant's false pretenses convictions formed an adequate basis for the Defendant's status as a Range II, Multiple Offender. As a consequence, the trial court need not have relied on the Defendant's larceny by conversion convictions in setting the Defendant's status as a Range II, Multiple Offender. These convictions, however, did support the trial court's application of enhancement factor (1), that the Defendant had a previous record of criminal convictions in excess of those necessary to set his Multiple Offender status.

The Defendant's larceny by conversion convictions appear on two separate certified judgment forms, which were entered into evidence at sentencing. Each judgment lists the conviction offense as "larceny by conversion-$10," and indicates that the Defendant entered a nolo contendere plea to each offense on April 10, 2006, in Muskegon County, Michigan. For both offenses, the Defendant was sentenced to between forty months and twenty years of imprisonment. The first judgment form orders the Defendant to pay $16,500 in restitution. No restitution order appears on the second judgment form. Probation officer Patrick Moore determined from a search of the Michigan Department of Corrections website that the Defendant had three convictions for "larceny by conversion-$1000 or more but less than $20,000." Officer Moore spoke by phone with Ms. Price of the Muskegon County Prosecutor's Office, who confirmed that, according to office records, the Defendant had three convictions for "larceny by conversion-$1000 or more but less than $20,000."

61

In Michigan, larceny by conversion occurs "where a person obtains possession of another's property with lawful intent, but subsequently converts the other's property to his own use." *People v. Christenson*, 312 N.W.2d 618 (1981); M.C.L.A. § 750.356 (2006). Like false pretenses, larceny by conversion is punishable according to the value of the property unlawfully obtained. If the value is "$1000 or more but less than $20,000," the offense is punishable by five years imprisonment and a fine of either $10,000 or three times the actual value of the property stolen. M.C.L.A. § 750.356(3)(A). The provisions governing the sentencing grading scheme for theft in Tennessee are set out above. *See* T.C.A. § 39-14-105(1)-(5).

As the Defendant correctly argues, the Tennessee Supreme Court held in *State v. Buck* that "computer print-outs" from national criminal information databases "are not admissible as a substitute for certified copies of court convictions nor for any other purpose." 670 S.W.2d 600, 607 (Tenn. 1984). In this case, however, the record contains certified copies of the judgments of conviction and sentence in Michigan that reflect that the Defendant has two convictions for "larceny by conversion-$10." Although the exact value of the property stolen during the course of these offenses is not immediately obvious from the face of these convictions, the record contains sufficient proof to establish beyond a reasonable doubt that these convictions involved an amount of "$1000 or more but less than $20,000."

First, the sentence imposed for each conviction, between forty months and twenty years, is commensurate with the applicable sentence in Michigan for the commission of larceny by conversion involving $1000 or more but less than $20,000. *See* M.C.L.A. § 750.356(3)(A). Second, both Ms. Price of the Muskegon County Prosecutor's Office and a search of the Michigan Department of Corrections website database both confirmed that the amount involved in the Defendant's larceny by conversion convictions was more than $1000 but less than $20,000. Although each of these pieces of evidence constitutes unreliable hearsay under *Buck* and, therefore, is not admissible "as a substitute" for certified copies of conviction, each is admissible to inform our interpretation of the certified copies of judgment entered in this case. Finally, the $12,200 amount of restitution awarded on the first judgment indicates that the value of the property stolen was at least $1000. *See* M.C.L.A. § 750.356(3)(A). Taking all of these things into account, we conclude that the record establishes beyond a reasonable doubt that the Defendant had two larceny by conversion convictions involving $1000 or more but less than $20,000. In light of Tennessee's theft grading statute, these offenses were the equivalent of Class D felony theft convictions in Tennessee. *See* T.C.A. § 39-14-105(1)-(5). Therefore, even had the trial court relied on these convictions in declaring the Defendant a Multiple Offender, its reliance would have been sound. Although the Defendant did not directly raise the issue, we state for clarity that the trial court did not err insofar as it relied on any two of these convictions in applying to his sentence enhancement factor (1), that the Defendant had a previous history of criminal

62

behavior in addition to that necessary to establish his range. The Defendant is not entitled to relief on this issue.

## 2. Due Process and Excessive Punishment Clauses

The Defendant contends his sentence violates the due process and excessive punishment clauses of the United States and Tennessee Constitutions. He argues that the circumstances of the Defendant's case, the nonviolent nature of his crimes, and the assistance the Defendant provided law enforcement in resolving a homicide investigation raise an "inference of gross disproportionality" in the sixteen-year sentences he received for each of his four convictions.

The State responds that, because the trial court based its sentence upon the proper sentencing criteria and principles, the Defendant's sentence is consistent with the purposes and principles of the Sentencing Act.

*State v. Harris* sets forth the analysis for determining whether a defendant's sentence is proportionate. 844 S.W.2d 601, 603 (Tenn.1992). In *Harris*, our Supreme Court adopted the methodology espoused in *Harmelin v. Michigan*, 501 U.S. 957, 994-1009 (1991). Under *Harmelin*, the sentence imposed is initially compared with the crime committed. *Harris*, 844 S.W.2d at 603. Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends, and the sentence is constitutional. *Id*.

In this case, the Defendant received a sentence of sixteen years for each of his convictions, which included two convictions for forgery and two convictions for criminal simulation. He contends that his sentence is grossly disproportionate to his crimes and that it violates his due process rights and his right against excessive punishments. We disagree.

The Defendant's behavior pattern of deception, manipulation, and theft is extensive. As the evidence introduced at sentencing bears out, he had multiple past theft-related convictions, and he was on escapee status from the Michigan Department of Corrections when he committed the crimes in this case. The trial court found that the five following enhancement factors applied to his case: enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; enhancement factor (3), that the offense involved more than one victim; enhancement factor (8), that, before sentencing, the Defendant failed to comply with the conditions of a sentence involving release into the community; enhancement factor (13), that, at the time the felony was committed, the Defendant was on escape status; and (14), that the Defendant abused a position of private trust. T.C.A. § 40-35-114(1), (3), (8), (13), and (14).

Although the Defendant's crimes involved no violence, they resulted in financial ruin to Ms. Turpin and her family. Also, Ms. Turpin's letter to the trial court clearly sets forth the impact the Defendant's forging her name, which resulted in her name being associated with the Defendant's crimes, has had upon her ability to maintain employment. Additionally, the Defendant Mr. Smith, the recipient of the checks in this case, allowed the Defendant and his wife, in reliance on the Defendant's representations, to reside for several weeks in a house on his farm, which unjustly enriched the Defendant with the rental value of the house for that period.

Also, the Defendant made false representations to the trial court of his financial assets and past employment in pre-trial proceedings and in his interview with the officer preparing his presentence report. Additionally, the trial court noted at sentencing that the Defendant maintained an arrogant, disrespectful attitude throughout the entirety of trial and sentencing.

Taking all of the circumstances surrounding the Defendant's crimes into consideration, and considering that the trial court followed proper sentencing procedure and considered all relevant sentencing principles when it sentenced the Defendant, we conclude that no inference of gross proportionality arises from the sentences received by the Defendant in this case. *See Harris*, 844 S.W.2d at 603. He is not entitled to relief on this issue.

### III. Conclusion

Having thoroughly reviewed the record and relevant authorities, we conclude that the Defendant was lawfully brought to trial within the prescribed Compact period, that his trial was lawfully conducted, that his convictions are supported by sufficient evidence, and that his sentence was lawfully imposed. As such, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

64